**TEAMSTERS LOCAL 282 PENSION TRUST FUND, Plaintiff-Appellant,**

v.

**Anthony G. ANGELOS, et al., Defendants-Appellees.**

No. 84–2141.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1985.

Decided May 13, 1985.

---

Edward J. Boyle, Wilson, Elser, Edelman & Dicker, New York City, for plaintiff-appellant.

John Powers Crowley, Cotsirilos & Crowley, Chicago, Ill., for defendants-appellees.

Before WOOD and EASTERBROOK, Circuit Judges, and DUMBAULD, Senior District Judge.*

EASTERBROOK, Circuit Judge.

The principal question in this case is whether a trustee's imprudent failure to investigate before investing relieves the other party of liability for securities fraud. We hold that it does not.

In early 1979 the trustees of Teamsters Local 282 Pension Trust Fund (the Fund) loaned $2,000,000 to the Des Plaines Bancorporation, Inc., a bank holding company (the Borrower). In March 1981 federal and state regulatory officials closed Des Plaines Bank (the Bank), a wholly-owned subsidiary of the Borrower and its principal asset. The Fund was left with an uncollectable loan.

Beneficiaries of the Fund, joined by the Secretary of Labor, promptly brought suits (the New York litigation) maintaining that the Fund's trustees made the loan without adequate investigation and so had violated their duties to the beneficiaries under the Employee Retirement Security Act of 1974 (ERISA), 29 U.S.C. § 1101 et seq. They contended, and the district court held, that an adequate investigation would have revealed the shaky status of the Bank and consequently the very high risk of the loan. *Katsaros v. Cody*, 568 F.Supp. 360 (E.D.N.Y.1983). The Second Circuit affirmed, 744 F.2d 270 (2d Cir.1984), summarizing the essential findings this way (744 F.2d at 279):

> The trustees, being ill-equipped to evaluate the soundness of the proposed loan, failed to observe their duty to obtain outside assistance. They relied exclusively on the representations of [the Borrower] as to its financial strength and reached an investment decision after wholly inadequate inquiry and delibera-

tion. A reasonable investigation would have revealed evidence that the loan was totally unsound.

Both the district court and the Second Circuit traced the trustees' duty to ERISA, which they concluded imposed on the trustees a requirement of prudence. "Prudence," in turn, was "measured according to the objective 'prudent person' standard developed in the common law of trusts." 744 F.2d at 279.

The trustees and the Fund (which participated fully in the New York litigation) filed a third-party complaint against the Borrower's directors and the law firm that had represented the Borrower in the loan, arguing that they had defrauded the trustees and concealed material adverse information. The New York court dismissed this complaint in August 1983, holding that the arguments should be raised in independent litigation.

In February 1984 the Fund filed this suit. We take all of our facts from the complaint, though doubtless the defendants portray the facts very differently. The Fund asserts that the directors of the Borrower, and the Borrower's counsel, "induced the Trustees to make the Loan through the use of fraudulent and/or negligent misrepresentations and omissions". In February 1979 the Federal Deposit Insurance Corporation had investigated the Bank and found many unacceptable practices. The FDIC's examiners concluded that the Bank was inadequately capitalized, had ineffective administration, owned an excessive volume of high-risk loans and was insufficiently liquid, and was in violation of many banking laws and regulations. The bank examiners' outlook was glum. Yet the Borrower's directors painted a fairly rosy picture of the Bank, representing "that the Bank was operating at a profit [and] that the Bank had only minor cash flow problems". Both the directors and the Borrower's counsel prepared documents that embodied this rosy picture,

---

* Hon. Edward Dumbauld, of the United States District Court for the Western District of Pennsylvania, sitting by designation.

and they withheld the FDIC's report from the Fund. The Fund's loan staved off the evil day for the Bank, but the undisclosed adverse conditions ultimately brought the Bank down, and the banking regulators closed it. The Fund contends that these acts violate Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5; and the common law of Illinois.

The district court granted summary judgment to all defendants. 585 F.Supp. 1401 (N.D.Ill.1984). It concluded that the New York litigation establishes conclusively that the trustees violated their fiduciary duty to investigate the Borrower and the Bank, that this fiduciary duty included a duty not to rely on the defendants' representations, and that if the trustees had investigated as they were required to do they would not have been taken in by any false statements or material omissions. The Fund, having participated in the New York litigation, is as bound by principles of issue preclusion (collateral estoppel) as are the trustees. The district court then held that each of the legal theories on which the Fund seeks recovery requires "justifiable reliance" on the false statements or omissions. This legal element, combined with principles of issue preclusion, doomed the case, the district court concluded. "All the Fund's claims rest on asserted misrepresentations on which the Fund claims to have relied. If Fund had no right to rely on these representations (indeed had the duty *not* to do so), an essential linchpin of its claims is missing." 585 F.Supp. at 1402–03 (emphasis in original).

## I

The Fund challenges the application of issue preclusion to the matters determined in the New York litigation. It says that the New York courts contemplated that their decisions would not bind subsequent courts. The New York district court remarked that the third-party complaint presented "issues unrelated or of doubtful relevancy to the issues in" the action against the trustees. The court also stated that "[a]ny claim the Fund may have under the federal securities laws may be asserted in an independent action." It dismissed the third-party complaint. The Fund contends that the New York judgment therefore is irrelevant here.

At least in federal litigation, though, the first court does not decide the preclusive effect of its judgments. The second court must decide for itself what matters were settled in the first case. *Dean Witter Reynolds, Inc. v. Byrd,* —— U.S. ——, 105 S.Ct. 1238, 1243–44, 84 L.Ed.2d 158 (1985). Because the New York litigation took place in federal court, 28 U.S.C. § 1738 does not apply. Federal courts apply federal principles of preclusion, and under these principles issues that were fully and fairly litigated between private parties may not later be relitigated, even though the second case entails a legal issue fundamentally different from the first. *Coward v. Colgate-Palmolive Co.,* 686 F.2d 1230, 1234–35 (7th Cir.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1526, 75 L.Ed.2d 948 (1983). Compare *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (federal principles), with *Marrese v. American Academy of Orthopaedic Surgeons,* —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (state rules apply if first case was decided in state court).

Perhaps the second court should honor the express conclusion of the first that a *claim* was not decided in that case, if only because this shows the absence of an opportunity to litigate that claim. See Restatement (Second) of Judgments § 26(1)(b) (1982); C. Wright, A. Miller & E. Cooper, 18 *Federal Practice and Procedure* § 4413 (1981). But this case involves issue rather than claim preclusion, and the New York courts did not purport to reserve any particular issues (as opposed to the securities claims at large) for subsequent litigation. We therefore need not decide with greater precision the effect the New York district court meant its decision to

have or whether New York would allow the first court to determine the preclusive effect of factual and legal decisions made on the way to its own judgments. The application of issue preclusion here means at least that the trustees breached a duty to investigate and that but for the failure to investigate the loss would not have occurred. We must decide the legal effects of these conclusions.

## II

The principal issue in the New York litigation was the application of ERISA to a substantial investment by the Fund. The New York courts concluded that ERISA tracks the common law of trusts, which imposes on trustees a duty to take the degree of care a "prudent man" would take in making important decisions. That duty entailed investigation of the Borrower's claims, not blind reliance on them.

An ordinary investor is under no duty to investigate, though, and many people invest large sums in reliance on representations made to them or on the accuracy of the market price of the investment. The self-interest of those who seek to maintain reputations for honest dealing, and the legal rules against fraud, are the primary guarantors of the accuracy of representations in securities transactions. Investors are entitled to rely on these incentives to speak the truth and to recover damages from those who breach their duty to speak truthfully. In many ways it is undesirable for would-be investors to investigate what the other party says. In a case such as this the Borrower's directors had the best access to the pertinent information. Those with access can reveal it at low cost. A single revelation will do. There are many potential investors, however, and if each must hire a financial investigator to check up on the other party, securities transactions will become more costly and securities markets less liquid and efficient. The greater the number of potential investors, and the less easy the investors' access to the information, the more costly investigation becomes.

Yet the preferred outcome—a world in which there are no lies and in which all investors are passive users of information—is not our world. Sellers of securities sometimes think they can get away with fraud or nondisclosure of material information. Investors therefore often choose to investigate the seller's statements in order to add to the deterrent force of the law and protect their interests. In liquid capital markets investment bankers, arbitrageurs, and other professional investors serve this investigative function. Their discoveries affect the price of the securities and bring that price closer to the one that is accurate in light of all available information. *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), shows this process at work. See also *Mills v. Electric Auto-Lite Co.*, 552 F.2d 1239, 1247 (7th Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977). The less widely distributed the investment (here there was just one buyer), the more useful any one investigation. The investor can realize for itself the value of additional knowledge, and if it does not investigate no one else is likely to. The common law of trusts, like a statute such as ERISA, rests on the judgment that a trustee of other people's money may do too little of this investigation. The trustee does not realize the gain or suffer the losses personally and so may be slipshod or careless. The law requires the trustee to act as if his own money were at stake.

If the trustee carries out the investigations required of him, there will be fewer losses. In this case the New York courts found that an adequate investigation would have averted the loss altogether. It is a separate legal question, though, whether a trustee's failure to protect the beneficiaries from harm should let the primary offender off the hook. We think not. The parties have cited no case—and we have found none—in which the failure of a trustee to investigate on behalf of the beneficiaries excused some other party from complying with a legal obligation to tell the truth. This is not surprising. Disclosure by the

seller of securities and investigation by the buyer are *cumulative* ways to get at the truth. Congress in enacting ERISA, and the courts developing the common law of trusts, wanted to encourage self-help by trustees who otherwise might not have the appropriate incentives to take care. This hardly means that if the trustee defaults, thereby increasing the chance of injury to the beneficiaries, the court should wink at the falsehoods or omissions of the sellers of the securities, thereby *further* increasing the chance of injury to the beneficiaries. The failure of one legal safeguard (the trustee's duty to investigate) is not a very good reason to extinguish another legal safeguard (the seller's duty to tell the whole truth). Remedies under the securities law are cumulative with other remedies, see *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383, 103 S.Ct. 683, 688, 74 L.Ed.2d 548 (1983), and although the Supreme Court has never addressed an overlap such as this one we think the same principles are in play.

The defendants might offer two lines of argument in response to this conclusion. The first analogizes the securities law to tort law and maintains that because the trustees breached a legal duty, and the breach was a but-for cause of the injury, they cannot recover. The second analogizes the trust agreement to an ordinary contract and maintains that sellers of securities are third-party beneficiaries of the trustees' duties to the beneficiaries. Neither line of argument gets defendants very far.

■ The first is a variant of a claim that the trustees were contributorily negligent, and that their negligence, like the seller's misrepresentations, was a but-for cause of the injury. For a long time contributory negligence was an absolute bar to recovery for negligence. Illinois, the state whose law governs the pendent claims here, has joined most other states in replacing the absolute bar of contributory negligence with the doctrine of comparative negligence. *Alvis v. Ribar*, 85 Ill.2d 1, 52 Ill. Dec. 23, 421 N.E.2d 886 (1981). Contrib-

utory negligence was never a bar to recovery for intentional torts. For reasons we develop below, contributory negligence by an investor is not a bar in securities cases, either.

■ The analogy to third-party beneficiary contracts fails for the simple reason that a securities offender is not an intended beneficiary of ERISA. Certainly the offender does not fall within the "zone of interests" protected by ERISA. Cf. *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The offender is not entitled to rely on the trustee's duties to the beneficiary, for which it gave no consideration. The offender may not even be aware of them. In the language of the Restatement (Second) of Contracts §§ 302, 304 (1981), the seller of securities is at best an "incidental beneficiary" of the trustee's duties and may not rely on the fulfillment of these duties. See *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1479–1480 (7th Cir.1985), which holds that it makes no difference whether an incidental beneficiary of a contract imposed by law argues for an implied right of action or a third party beneficiary recovery; neither is permitted unless the statute creates special rights in favor of the person making the claim. We therefore conclude that duties created by ERISA do not inure to the benefit of issuers of securities. This leaves the question whether the Fund could recover if it were a natural person trading for its own account and omitted to investigate the Borrower's statements.

### III

The defendants say that *any* reasonable investor must conduct an investigation in the event of a substantial private placement such as this one. This obligation to protect oneself exists independently of ERISA, defendants maintain, and therefore the Fund still may not recover. Had the trustees but done what any investor should have done, there would have been no loss here.

This line of argument, too, fails, because it does not give to the seller's obligation to tell the truth the primacy that obligation must have. Securities law seeks to impose on issuers duties to disclose, the better to obviate the need for buyers to investigate. The buyer's investigation of things already known to the seller is a wasteful duplication of effort. If the securities laws worked perfectly there would be little need for investigation; sellers would disclose to the buyers and the market the information necessary for informed trading. See Coffee, *Market Failure and the Economic Case For a Mandatory Disclosure System*, 70 Va.L.Rev. 717 (1984); Gilson & Kraakman, *The Mechanisms of Market Efficiency*, 70 Va.L.Rev. 549 (1984); Grossman, *The Informational Role of Warranties and Private Disclosure about Product Quality*, 24 J.L. & Econ. 461 (1981). Because some frauds will not be caught, and because people cannot interpret information flawlessly, this mechanism cannot work perfectly. This failure makes investigations by investors necessary and creates incentives for sellers to hire certifiers (such as auditors and investment bankers) to verify the sellers' statements. But such investigations and other devices are distinctly second-best solutions to legal and practical problems, and we will not establish a legal rule under which investors must resort to the costly self-help approach of investigation on pain of losing the protection of the principal legal safeguard, the rule against fraud.

This is just another way to state the common law rule that contributory negligence is not a defense to an intentional or reckless tort. Prosser & Keeton, *The Law of Torts* 462 (5th ed. 1984); Restatement (Second) of Torts §§ 481, 482 (1965). The best solution is for people not to harm others intentionally, not for potential victims to take elaborate precautions against such depradations. If the victims' failure to take precautions were a defense, they would incur costs to take more precautions (and these costs are a form of loss victims would feel in every case, even if the tort does not occur), while would-be tortfeasors would commit additional torts because they would not fear the need to pay up in cases where the victims do not protect themselves. Common law courts have balked at such an outcome in ordinary tort cases, and securities law has followed the same path.

This is not to say that buyers of products (including securities) need not investigate what it is they are getting. Often the law imposes no obligation to disclose. Much information is commercially valuable, and people must hide this information to exploit its value. If they could not hide it, they would not have the right incentives to produce it. See *United States v. Dial*, 757 F.2d 163, 168 (7th Cir.1985). The law of trade secrets is based on this proposition, and there are many other instances in which information must be got at by investigation or not at all. E.g., *Laidlaw v. Organ*, 15 U.S. (2 Wheat.) 178, 4 L.Ed. 214 (1817); Kitch, *The Law and Economics of Rights in Valuable Information*, 9 J. Legal Studies 683 (1980); Kronman, *Mistake, Disclosure, Information, and the Law of Contracts*, 7 J. Legal Studies 1 (1978). The first question for the legal system is whether to create a duty to disclose information truthfully. Such a duty, if created, rests on the proposition that the information ought to come out, and that people ought *not* be left to their own investigative talents. Once the duty to disclose exists, and lying or nondisclosure is condemned as an intentional tort, it no longer matters whether the buyer conducts an investigation well or at all.

A violation of Section 17(a)(1) or Rule 10b–5 is an intentional tort, requiring wilful or at least reckless misstatement. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). We therefore concluded in *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977), that in a case under Rule 10b–5 the defense of the buyer's "failure to exercise due care or diligence ... is not available in an intentional fraud case."

See also *Competitive Associates, Inc. v. Krekstein, Horwath & Horwath,* 516 F.2d 811 (2d Cir.1975); but cf. *Dupuy v. Dupuy,* 551 F.2d 1005, 1015 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). We drew a line between fraud and negligent nondisclosure: "In a nondisclosure case, reliance is vitiated if the plaintiff is chargeable with the omitted information.... But under a reckless or *Hochfelder scienter* standard, '[i]f contributory fault of plaintiff is to cancel out wanton or intentional fraud, it ought to be gross conduct somewhat comparable to that of defendant.'" *Id.* at 1048, quoting from *Holdsworth v. Strong,* 545 F.2d 687, 693 (10th Cir.1976) (en banc). See also *Goodman v. Epstein,* 582 F.2d 388, 405 & n. 47 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), stating in dictum that in light of *Hochfelder* the victim's want of "due diligence" is no longer a defense in actions under Rule 10b–5.

Neither this nor (to our knowledge) any other appellate court has relieved a lying securities defendant of liability on the ground that the other party failed to nose out the truth. Courts have gone quite the other way. Many cases allow recovery even though the plaintiff did not even see the false statement, let alone investigate or rely on it in fact. This is the upshot of the "fraud on the market" doctrine, which states that falsehoods or material omissions can affect the market price of a security and thus injure investors who rely on the informativeness and accuracy of this price without conducting their own investigations. See *Lipton v. Documation, Inc.,* 734 F.2d 740 (11th Cir.1984); *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated*

as moot, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975); Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities,* 38 Bus.Law. 1, 7–12 (1982). These courts allow the investors to rely on the issuer (and the market) to supply accurate information. They need not dig for more.* Liability follows from wilful material misstatements or omissions plus causation in fact, not from "justifiable reliance" in the common sense of that term. See *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–54, 92 S.Ct. 1456, 1471–72, 31 L.Ed.2d 741 (1972) (awarding relief to investors who did not investigate the state of the market, even though the information was readily available).

■ We do not hold that liability is absolute. It is not. The point of the discussion in *Sundstrand* about the plaintiff being "chargeable with the omitted information" and perhaps not eligible to recover if guilty of "gross conduct" is that disclosure by the defendant is not the only goal of the securities law. Not every fact must be disclosed, and at all events the laws do not create liability unless the false or omitted information significantly affected the "total mix" of information. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). In at least three circumstances even lies are not actionable. The first is illustrated by *Zobrist v. Coal-X, Inc.,* 708 F.2d 1511 (10th Cir.1983), on which the defendants rely. The issuer of securities gave the investor a memorandum disclosing in minute detail the risks of the venture; oral statements,

---

* The argument that an investor must act so as to prevent injury to himself has a parallel in the *in pari delicto* doctrine. Many cases allow recovery by a party who also violated the securities laws. See *Berner v. Lazzaro,* 730 F.2d 1319 (9th Cir.), *cert. granted sub nom. Bateman Eichler, Hill Richards, Inc. v. Berner,* —— U.S. ——, 105 S.Ct. 776, 83 L.Ed.2d 772 (1985), argued Apr. 15, 1985. The issue before the Supreme Court in *Berner* is whether to reject the doctrine of *in pari delicto* altogether or instead to use it to foreclose recovery in cases of relatively equal fault; even though one interpretation of the *in pari delicto* principle is that but for the plaintiff's wrongdoing he would have suffered no loss, no one argues in *Berner* that each failure to perform a duty causally linked to the loss forecloses recovery. Unless the Supreme Court holds in *Berner* that any causal link between a plaintiff's injury and his breach of any legal duty (even, as here, a duty created outside the securities law) relieves the defendant of liability, the analysis in the text remains sound.

**530**

though, falsely assured the buyer that there was "no risk." The Tenth Circuit held that the buyer could not justifiably rely on the assurance of "no risk" because he held the truth in his hand and should have read the memorandum. In *Zobrist,* in other words, the issuer *did* disclose the truth, but also told a lie. The principle that the written statement controls the oral one is a staple of contract law, and we agree with the Tenth Circuit that it should be used in securities law as well. The securities laws are designed to induce issuers to commit their representations to writing, and judicial use of the writings as the authoritative disclosure promotes certainty and thus planning. When the issuer discloses the truth, an oral variance is not a legal cause of the injury. As the Tenth Circuit explained its holding that the buyer did not justifiably rely on the oral representation (*id.* at 1517): "Justifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b–5 action which insures that there is a causal connection between misrepresentation and the plaintiff's harm."

■ The second circumstance is a generalization of the first: an investor cannot close his eyes to a known risk. See *Sundstrand, supra,* 553 F.2d at 1044, 1048. If the investor already possesses information sufficient to call the representation into question, he cannot claim later that he relied on or was deceived by the lie. This is not because he has a duty to investigate lies or prevent intentional torts, though; it is, rather, because the securities laws create liability only when there is a "substantial likelihood" that the misrepresentation "significantly altered the 'total mix' of information" that the investor possesses. *TSC Industries, supra,* 426 U.S. at 449, 96 S.Ct. at 2132. If the investor knows enough so that the lie or omission still leaves him cognizant of the risk, then there is no liability. The investor cannot ask a court to focus on the lie and ignore the remaining pieces of information already available to him (or, in the case of a publicly traded security, already available to oth-

ers and reflected in the price of the security).

■ Third, the falsehood or omission may concern things known to the listener equally or better than to the speaker. For example, in *Seaboard World Airlines v. Tiger Int'l,* 600 F.2d 355 (2d Cir.1979), the court held that a misstatement by one party about information best known to the other could not be a ground of liability. The purpose of the securities laws is to induce people to disclose information peculiar to their own businesses; when someone else has equal or better access to the information, he must use that information rather than claim that he was deceived by the statements of the less knowledgable party. The defense of *in pari delicto* may be a fourth exception, a question now before the Supreme Court.

■ These exceptions collectively are the "reliance" requirement. None assists the defendants—not, at least, in the current posture of the case, in which we must take the allegations of the complaint as true. Any lies by the defendants were not contradicted by truthful information in the Fund's possession; the lies and omissions significantly affected the "total mix" of information; the missing information was much more readily accessible to the defendants than to the Fund. Certainly the Fund has committed no "gross conduct" comparable to that of the defendants. We therefore conclude that the Fund's lackadaisical investigation, even though a but-for cause of the injury, does not preclude the Fund's suit under the securities laws. The § 17(a) and Rule 10b–5 claims must be reinstated.

In saying this, we do not pass on a question that is open in this circuit—whether there is a private right of action to enforce § 17(a). See *Peoria Union Stock Yards Co. v. Penn Mutual Life Ins. Co.,* 698 F.2d 320, 323–24 (7th Cir.1983). We held in *Daniel v. Teamsters,* 561 F.2d 1223, 1244–46 (7th Cir.1977), *rev'd on other grounds,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), that there is such an action. But the Court's reversal of our judgment, coupled with its express refusal

to decide the § 17(a) issue, 439 U.S. at 557 n. 9, 99 S.Ct. at 795 n. 9, removed the authority of the discussion in *Daniel.* Since then the Court has altered the standards for implying private rights of action and pointedly declined to address the § 17(a) issue. *Herman & MacLean, supra,* 459 U.S. at 378 n. 2, 103 S.Ct. at 685 n. 2. Our court has not considered the issue after *Daniel,* and we do not do so now. We indicated in *Penn Mutual* that in a case in which a Rule 10b–5 action is available, there is no reason to think that a § 17(a) action would have different elements, and the claim therefore adds nothing to plaintiff's arsenal. The Fund has not argued that a private party gets the benefit of the holding in *Aaron* that §§ 17(a)(2) and (3) do not require wilful misconduct. Here, as in *Penn Mutual,* the suit should proceed as if only a Rule 10b–5 claim had been raised.

Because we conclude that the securities claims must be resurrected, we need not pass on the adequacy of the claims based on the common law of fraud in Illinois. The Fund does not suggest that it would be entitled to any remedy under Illinois law of fraud that is unavailable under Rule 10b–5, or that its burden of proof on claims of intentional misstatements would be any easier under Illinois law. To the contrary, Illinois law may impose on plaintiffs a slightly greater burden of investigation than we believe the securities laws create. The Illinois cases state that although "plaintiff's negligence is not generally a defense in an action for fraud," the plaintiff nonetheless must investigate in certain cases, and "if ample opportunity existed to discover the truth, then reliance is not justified." *Central States Joint Board v. Continental Assurance Co.,* 117 Ill.App.3d 600, 73 Ill.Dec. 107, 112, 453 N.E.2d 932, 937 (1st Dist.1983); see also, e.g., *Hamming v. Murphy,* 83 Ill.App.3d 1130, 39 Ill.Dec. 435, 438, 404 N.E.2d 1026, 1029 (2d Dist.1980); *National Republic Bank of Chicago v. National Homes Construction Corp.,* 63 Ill.App.3d 920, 21 Ill.Dec. 80, 84, 381 N.E.2d 15, 19 (1st Dist.1978). We have interpreted such statements as meaning

that if a plaintiff has in fact investigated and discovered the truth (or at least discovered a substantial chance that the defendant's statements were false), the plaintiff may not close his eyes and claim that he relied on the falsehood. *Peterson Indus., Inc. v. Lake View Trust & Savings Bank,* 584 F.2d 166, 168–69 (7th Cir.1978).

The Illinois cases on which defendants rely generally seem to fit into the categories we discussed above. The question in *National Republic,* for example, was whether a bank properly relied on statements by a general contractor about the status of work by a subcontractor, when the bank was aware of problems in the subcontractor's work and payment history and both the bank and the general contractor were well placed to observe what the sub was doing. This is an example of the third category, relatively equal access to information and no strong reason to prefer investigation by one party over the other. The question in *Central States* was whether an employer was deceived by oral representations about the contents of its pension plan when it possessed a written copy of the plan with all the information. This is similar to *Zobrist* and fits comfortably into the first category, inconsistent oral and written statements. We therefore are not persuaded that there is a significant difference between state and federal law here. But we lack the authority to interpret state law with the same freedom we possess in construing federal law, and we shall refrain from harmonizing the state cases unless we are persuaded that it is important to the further conduct of this litigation.

■ To the extent the Fund relies on the Illinois law of negligent misrepresentations, however, we believe that the state cases support the defendants. As we read the cases cited above, and the related state cases, the plaintiff has a duty to make a reasonable inquiry before blaming the defendant for negligent omissions or misstatements. The findings in the New York litigation foreclose the argument that the

**532**

Fund's investigation was prudent or adequate under the circumstances.

### IV

The defendants argue that the suit was filed after the expiration of the statute of limitations, and they urge us to affirm the judgment on that basis. Although *Massachusetts Mutual Life Ins. Co. v. Ludwig,* 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976), holds that an appellee may defend its judgment on any ground properly preserved in the district court, whether or not that court passed on the argument, we do not consider the limitations argument. The Fund has argued that the limitations period should be tolled or excused, and this presents factual issues on which the record is not properly developed. Cf. *Peoria Union Stock Yards Co., supra,* 698 F.2d at 326; *Heiar v. Crawford County,* 746 F.2d 1190, 1197 (7th Cir.1984). The district court must consider this question in due course.

It must also determine whether a loan privately negotiated between one buyer and one seller is a security, see *Marine Bank v. Weaver,* 455 U.S. 551, 559–60, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982), and, if it is, whether the defendants made false statements or material omissions with the degree of scienter required by *Hochfelder* and *Sundstrand.* If the case founders on the definition of a security, it may be necessary to answer the question we pretermitted—whether Illinois and federal law treat identically the failure of an investor to investigate or expose intentionally or recklessly false statements or material omissions—if there is an independent ground of jurisdiction over the state claim. We leave all these questions to the district court in the first instance.

The judgment is affirmed to the extent it grants summary judgment for the defendants on the Fund's claim of negligent misrepresentation under Illinois law; the rest of the judgment is reversed, and the case is remanded for further proceedings. Appellants will recover 75 percent of their costs.