TEAMSTERS LOCAL 282 PENSION TRUST FUND, Plaintiff,

v.

Anthony G. ANGELOS, et al., Defendants.

No. 84 C 1312.

United States District Court, N.D. Illinois, E.D.

Dec. 20, 1985.

Sherman Carmell, Carmell, Charone & Widmer, Ltd., Chicago, Ill., Thomas R. Manisero, Wilson, Elser, Edelman & Dicker, New York City, for plaintiff.

Mark E. Ferguson, Bruce A. Featherstone, Kirkland & Ellis, John Powers Crowley, Matthew Kennelly, Cotsirilos & Crowley, Jerome H. Torshen, Robert J. Slobig, Jerome H. Torshen, Ltd., Ira J. Bornstein, Harvey J. Barnett, Harvey J. Barnett & Associates, Ltd., Julius Lucius Echeles, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Teamsters Local 282 Pension Trust Fund ("Fund") initially brought this action against ten defendants,[1] asserting two counts of securities fraud under federal law and one count each of fraud and negligent misrepresentation under Illinois law. In *Teamsters I,* 585 F.Supp. at 1405 this Court dismissed the case in its entirety. In *"Teamsters II,"* 762 F.2d 522 (7th Cir.1985)

our Court of Appeals affirmed dismissal of the negligent misrepresentation count but reversed and remanded as to the other three, directing this Court to consider the following questions (*id.* at 532):

1. whether Fund had brought suit after the expiration of the applicable statute of limitations;

2. whether the transaction in suit involves a security and:

(a) if so, whether defendants had made false statements or material omissions with the degree of scienter required by *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) and *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977), or

(b) if not, whether there is any other basis for federal jurisdiction over the remaining state-law fraud claim.

Howe, Jensen, Karkazis, Kirie and Jenner & Block have now moved under Fed.R. Civ.P. ("Rule") 56 for summary judgment based on the statute of limitations. For the reasons stated in this memorandum opinion and order, that motion is granted and this action dismissed as to all defendants.[2]

### Facts [3]

On March 1, 1979 Fund loaned $2 million (the "Loan") to Bancorporation, a bank

---

1. Defendants originally comprised nine directors (collectively "Directors") of Des Plaines Bancorporation, Inc. ("Bancorporation")—Anthony G. Angelos ("Angelos"), C.J. Bassler, Jr., Jonathan T. Howe ("Howe"), Clarence L. Jensen ("Jensen"), Lambrose Karkazis ("Karkazis"), James C. Kirie ("Kirie"), James Kokonas, James Verros ("Verros") and Herbert C. Wenske ("Wenske")—and the Jenner & Block law firm. As this Court's opinion in *"Teamsters I,"* 585 F.Supp. 1401, 1402 n. 1 (N.D.Ill.1984) reflects, Fund later elected to dismiss its claims against Verros and Wenske, leaving the other eight defendants still in the case.

2. Angelos' attorney has only very recently (November 27, 1985) filed his appearance in this matter. Though Angelos did not join in the present motion when originally made, counsel

at the time he appeared before this Court announced his intention to do so. Jensen and Karkazis have also moved under Rule 12(b)(6) to be dismissed from the complaint. Because Fund's entire action is time-barred, it is unnecessary to reach the issues presented by the Jensen-Karkazis motion.

3. Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant—here Fund. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). In this case, however, the relevant facts were established in prior litigation involving Fund, *Katsaros v. Cody,* 568

holding company whose principal asset was Des Plaines Bank ("Bank"). That possible borrowing had been broached by Angelos to Fund trustee John Cody ("Cody") in late January, and Howe then wrote Cody to outline the terms of the proposed loan and to request a conference about it with Fund's trustees ("Trustees") at Trustees' February 27 meeting. Cody, Howe and Angelos met to review the matter February 26, but it was not until the February 27 Trustees' meeting that Howe distributed copies of Bank's and Bancorporation's financial statements. On that date (when all Trustees other than Cody first learned of the loan application) Howe and Angelos made a two-hour presentation to Trustees, "touch[ing] on the highlights of the [financial] statement." *Katsaros*, 568 F.Supp. at 364. Trustees then voted unanimously to approve the Loan.

Bancorporation agreed to make semiannual payments of $125,000 in principal plus accrued interest for 3½ years, with the entire balance falling due in a balloon payment on the Loan's fourth anniversary. Bancorporation also agreed to provide updated financial statements to Fund. As security for repayment of the Loan, Bancorporation pledged all of Bank's stock and Angelos gave his personal guaranty secured by his interest in a Chicago vacant lot. Bancorporation furnished Jenner & Block's opinion letter (the "Opinion Letter") stating there were no actions, suits or proceedings pending against Bancorporation or Bank that would adversely affect the operations of either.

What Bancorporation did not disclose was the fact Bank had been investigated during February 1979 by Federal Deposit Insurance Corporation ("FDIC"). Based upon that investigation, FDIC had concluded (*Teamsters II*, 762 F.2d at 524):

Bank was inadequately capitalized, had ineffective administration, owned an excessive volume of high-risk loans and was insufficiently liquid, and was in violation of many banking laws and regulations.

Neither the fact nor the results of FDIC's investigation was disclosed in the Opinion Letter.

Bancorporation made three timely payments on the Loan, the last being an August 30, 1980 payment of $228,374. On March 14, 1981 federal and state regulatory officials closed Bank down. That left the Loan uncollectible.

Certain Fund beneficiaries then brought suit against Trustees under 29 U.S.C. § 1104(a) ("ERISA") for breach of their fiduciary duty in connection with approval of the Loan. In 1982 the Secretary of Labor also brought suit against Trustees under ERISA. Fund was joined as a defendant in both actions, which were consolidated for trial in the United States District Court for the Eastern District of New York.

In July 1983, following a bench trial, District Judge Jacob Mishler issued findings of fact and conclusions of law in the consolidated cases. *Katsaros*, 568 F.Supp. at 362–69, 371.[4] In the course of concluding Trustees had violated their ERISA duty to investigate the Loan's propriety, Judge Mishler found an independent investigation and analysis of the financial statements of Bancorporation, Bank and Angelos would have revealed (*id.* at 367–69):

1. Bancorporation's sole source of income was Bank's earnings.

2. Bancorporation's stated net worth of $1.8 million included good will valued

---

F.Supp. 360 (E.D.N.Y.1983), *aff'd as modified,* 744 F.2d 270 (2d Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), and are binding on Fund here according to familiar principles of defensive collateral estoppel. See *Teamsters I*, 585 F.Supp. at 1403–05. Though our Court of Appeals reversed this Court's *Teamsters I* holding as to the legal effect of *Katsaros* on Fund's claims here, it did not dis-

pute the applicability of collateral-estoppel principles as to *facts* found in *Katsaros*.

**4.** Judge Mishler's findings and conclusions were affirmed with a minor modification irrelevant for present purposes, 744 F.2d 270 (2d Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

at $1.3 million, leaving only $500,000 in tangible net worth.

3. Bank's significant earnings increase in 1978 was due to acquisition of a portfolio of risky loans bearing high interest rates. That increase in loan risk strained Bank's limited resources.

4. Bank's capital adequacy ranked 149th out of 151 among similarly-sized Illinois banks.

5. Bank's loan loss reserve was smaller than conservative (and hence sound) banking practice would require.

6. Bank's earning power ranked 96th of 151 among similarly-sized Illinois banks and was not stated in a manner reflecting the riskiness of outstanding loans.

7. Bank's net income in 1978 was $278,000, while the Loan obligated it to repay $250,000 per year in principal alone, plus interest of over $200,000 in each year. Thus Bank would be (to say the least) unable to meet its obligations under the Loan if earnings continued at the 1978 level.

8. Though Trustees were told Bank's cash-flow problem was the reason for its need of the Loan, the available cash proceeds of the Loan (just $500,000) "could only have had a minimal effect toward solution of the problem" (*id.* at 368).

9. Bank's stock was inadequate security for the Loan.

10. Angelos' asserted $1,386,000 interest in the Chicago vacant lot was unsubstantiated (a later appraisal put its value at $252,000).

Judge Mishler also concluded (*id.* at 369): With a minimum of effort the Trustees could have questioned the Central National Bank concerning the history of its loan to the Bank. The unpaid principal amount of the loan at that time was about $1 million and renewal of the loan was refused by Central National. In all probability, inquiry would have led the Trustees to learn that at least five (5) banks in the Chicago area refused to refinance the Central National Bank loan which was due to mature on March 1, 1979. Such inquiry could reasonably have led to a disturbing report issued by the FDIC underscoring the Bank's undercapitalization, its loan-deposit ratio, and the high percentage of both substandard loans and restaurant loans.[5]

*Statute of Limitations Analysis* [6]

Fund's federal claims are asserted under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) ("Section 17(a)") and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"). Neither Section 17(a) nor Section 10(b) contains its own statute of limitations, and the forum state's limitations law must be applied. See *Hochfelder,* 425 U.S. at 210 n. 29, 96 S.Ct. at 1389 n. 29 (Section 10(b)); *Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d 123, 125 (7th Cir.1972) (Section 10(b) and Section 17(a)). In Illinois that limitations period is three years. *Parrent,* 455 F.2d at 126.[7]

5. Judge Mishler also found a "cursory examination" of financial statements submitted by Bancorporation after the Loan's closing date "would have revealed that the Bank had discussed corrective measures with [FDIC]." 568 F.Supp. at 365. It is not clear from the context just when Fund received those statements—perhaps that was as late as March 1981.

6. Of course the question whether the Loan is a "security" at all (an issue neither side has briefed) logically precedes the question whether the statute of limitations under the securities laws has run. In view of this Court's conclusion as to the untimeliness of Fund's action under the securities laws, however, the Loan's "security" status has been assumed arguendo. If the Loan were not a security, there would of course be no remaining federal cause of action, and the state law fraud claim would be dismissed for the same reason stated at the end of this opinion. Hence there is no jurisprudential drawback to making the arguendo assumption.

7. *Parrent* held the Illinois Securities Law's three-year period better effectuated federal policy under Sections 10(b) and 17(a) than Illinois' five-year period for fraud actions in general. Our Court of Appeals reasoned in part that Section 10(b) and 17(a) liability—like liability under the Illinois Securities Law but unlike common-law fraud liability—did not require proof of scienter. See *Tomera v. Galt,* 511 F.2d 504, 508–09 (7th Cir.1975) (explaining *Parrent*'s reasoning).

Fund filed this lawsuit February 10, 1984, almost five years after the Loan closed. Movants understandably argue the action is time-barred. Fund retorts it was not aware of any misrepresentations or material omissions until Bank was closed down on March 14, 1981, so the limitations period should be equitably tolled.

No doubt the federal doctrine of equitable tolling applies to Section 10(b) and 17(a) actions (*Parrent,* 455 F.2d at 128):

> [T]he statute does not begin to run until the fraud is discovered where a plaintiff injured by fraud "remains in ignorance of it without any fault or want of diligence or care on his part ... *Bailey v. Glover,* 21 Wall. [88 U.S.] 342, 348 [22 L.Ed. 636] [ (1875) ]." *Holmberg v. Armbrecht,* 327 U.S. 392, 397 [66 S.Ct. 582, 585, 90 L.Ed. 743] ... (1946).

Accordingly the issue here is whether Fund's professed ignorance of the alleged fraud was "without any fault or want of diligence or care on [its] part." As *Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir.1974) (citations omitted) put it, after quoting that language from *Bailey:*

> It is well established that a plaintiff may not merely rely on his own unawareness of the facts or law to toll the statute.... The plaintiff, rather, has the burden of showing that he "exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Morgan v. Koch* [419 F.2d 993, 997 (7th Cir. 1969) ]. The statutory period "[does] not await appellant's leisurely discovery of the full details of the alleged scheme." *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970).

Fund rests its claim for tolling on the confidentiality of FDIC's February 1979 report on Bank's problems. But even on the assumption most favorable to Fund (that it could not independently have obtained a copy of FDIC's report), Judge Mishler's *Katsaros* findings establish ordinary dil-

igence on Fund's part would have alerted it to inadequacies and inconsistencies in Bancorporation's disclosure documents.

■ *Teamsters II,* 762 F.2d at 528 teaches a securities investor may have a cause of action for fraud under Section 10(b) or 17(a) whether or not he or she has independently investigated the soundness of a seller's claims, so long as he or she brings the action within the three-year limitations period. But here Fund argues for more than securities-fraud relief in itself: Though it concedes the statute of limitations had run before it filed suit, Fund contends it is entitled to equitable tolling of the statute, and *that* contention requires its own showing of diligence (*Goldstandt v. Bear, Stearns & Co.,* 522 F.2d 1265, 1269 (7th Cir.1975) (interpreting parallel principles under Securities and Exchange Commission Rule 10b–5)):

> Even if certain investors can rely upon large brokerage houses for legal advice and sue under 10b–5 if such advice is fraudulently given, they cannot necessarily continue to so rely until they find out otherwise and still bring suit years after the statute of limitations has run. Different policy considerations are involved. In the investor-fraud situation there is a congressional intention to prevent all fraudulent misrepresentations involving the sale of stock. This might well include fraudulent legal opinions. But there is also an intention to limit the time in which suits based on such fraud can be brought. If the only concern was preventing fraud we might allow such suits no matter when they are filed. But fairness requires a cut-off point and an exception is made to the cut-off point only when a plaintiff, due to defendant's fraudulent concealment, could not have known that a wrong occurred. Here, plaintiffs could have known. Their failure to act upon the facts known to them resulted in their suit being time barred.

Though that policy rationale is no longer viable after *Hochfelder,* the applicability of the three-year limitations period has not been questioned in post-*Hochfelder* cases. See *Peoria Union*

*Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.,* 698 F.2d 320, 326 (7th Cir.1983) (citing *Parrent* and reaffirming such applicability).

Thus, while a securities-fraud plaintiff bears no general "due diligence" responsibility as a precondition to suing, any fraud plaintiff (including a securities-fraud plaintiff) seeking to toll the statute of limitations must show he or she did not ignore obvious danger signals: There is "no license to ignore events giving rise to strong suspicion." *McCarthy v. PaineWebber, Inc.*, 618 F.Supp. 933, 937 (N.D.Ill.1985).

This Circuit's leading authority on equitable tolling of fraud claims, *Tomera*, 511 F.2d at 510, identified two fact paradigms often involved in such cases, each invoking a different principle for tolling purposes:

1. Plaintiff does not discover the fraud even though defendant does nothing to conceal it after commission.

2. Plaintiff does not discover the fraud because defendant has taken positive steps to cover up after commission.

In the first of those situations, "plaintiffs' due diligence is essential" to toll the statute, while in the second, the statute is tolled until plaintiff actually discovers the fraud (*id.*). Thus the relevant inquiry looks to defendant's post-fraud conduct—the presence or absence of an effective coverup.[8]

Here though, Fund does not even allege the existence of any coverup. Instead it simply says Bancorporation's timely payments through August 30, 1980 lulled Fund into believing all was well and did not alert Fund to the fact investigation was needed.

That argument is many days late—and consequently many dollars short. Bancorporation's timely compliance with its Loan obligations cannot be equated with fraudulent concealment on its part. Making the payments was not an act that hid facts otherwise available to Fund, see *Peoria Union Stock Yards*, 698 F.2d at 326:

The statute of limitations in a securities fraud case is tolled if the seller keeps the buyer from learning that the seller used misrepresentation and omission to make the sale.

True enough, Fund may have rested easily while the timely payments were made, and if Fund had brought this action within the prescribed three-year period no more would have been required. But it must be remembered that state of blissful ignorance was the product of Fund's lack of due diligence from the outset—a lack that has been judicially established and is conclusive on Fund. Nor is this a case where a party's sense of security (however unjustified) continued until it was too late to act. Almost exactly an entire year of the three-year period remained open when the regulatory officials actually shut Bank down (the most recent payment on the Loan having been missed two weeks earlier). There was plenty of time left for Fund to launch and complete even a belated investigation and still bring suit well under the three-year wire (or even, if time proved to be tight during the course of such a belated investigation, to shoot first [filing suit to avoid limitations problems] and ask the remaining questions later[9]).

Fund did not do that. Having passively (and unjustifiably) relied on Bancorporation's initial representations at face value, it continued to do so. Because Bancorporation's timely payments did not in themselves conceal any of the bells and whistles Fund should have noticed at the outset, Fund cannot gain the benefit of the fraudulent-concealment form of equitable tolling.

In sum, as Judge Mishler's findings lucidly illustrate, Fund had ample opportunity—and indeed Trustees had the *duty*—to notice and investigate inconsistencies and inadequacies in Bancorporation's represen-

---

8. Intermediate cases could perhaps be hypothesized—for example, where defendant engages in an active but ineffectual coverup. Any such possible variant need not be considered here, however.

9. That last possibility, however remote, merits a parenthetical comment. This Court has often spoken to the pre-filing investigative responsibil-

ity imposed on litigants and their counsel by Rule 11. If however Rule 11's "reasonable inquiry" still left counsel faced with a choice between turning over the last few investigative stones and letting a statute of limitations run, no court would consider sanctions for filing suit without having completed all the spadework.

tations, wholly apart from FDIC's adverse report. Judge Mishler found specifically, 568 F.Supp. at 369:

> In approving the loan of $2 million to Bancorporation the Trustees [and hence, for current purposes, Fund] ... fail[ed] to use that degree of care, skill, prudence and diligence that a prudent man would exercise under the circumstances then prevailing.[10]

It was not an impenetrable secret that something was rotten in Des Plaines. Nor does Fund have any compelling call on the equitable conscience, having slept on its rights well beyond the full year of the limitations period that remained open even after the situation was forcibly called to its attention by Bank's shutdown. There is thus no predicate here for equitable tolling of the expired statute of limitations, and Fund's federal securities claims are dismissed as time-barred.

That leaves only Count III,[11] the common-law fraud claim asserted under the doctrine of pendent jurisdiction. At this point there is no longer a federal claim to which the state claim can be pendent, and in such cases the Supreme Court has said (*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)):

> Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

See also *Nemkov v. O'Hare Chicago Corp.*, 592 F.2d 351, 353 n. 1 (7th Cir.1979) (district court properly dismissed pendent state-law claims where federal securities-fraud claims were dismissed as time-barred). Pendent jurisdiction being a doctrine of discretion (*Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139), this Court will dismiss Fund's common-law fraud claim for lack of subject matter jurisdiction.[12]

### *Conclusion*

Fund's claims under the federal securities laws were brought after the statute of limitations had run, and Fund has shown no basis for equitable tolling. Those claims are therefore dismissed. Fund's pendent state-law fraud claim is dismissed for lack of subject matter jurisdiction. Fund's previously-asserted claim of negligent misrepresentation having earlier been rejected, this action is dismissed in its entirety as to all defendants.

---

**10.** That determination gives the lie to Fund's argument that issues of fact remain open to preclude summary judgment on limitations grounds. Fund's last filing (a July 29, 1985 letter memorandum from its counsel) states misleadingly at page three (citing *Hupp*):

> The *Katsaros* court's findings relate to the high duty of care owed by the Trustees, as fiduciaries, to the Fund and its participants and beneficiaries. In contrast, the due diligence necessary to invoke an equitable toll of the statute of limitations is that required of an ordinary prudent man.

To the contrary, the quoted language from *Katsaros* specifically applied the "prudent man" standard and found it had not been met by Fund's Trustees (who *were* the Fund for present purposes).

**11.** It will be recalled our Court of Appeals affirmed this Court's prior dismissal of Complaint Count IV, sounding in negligent misrepresentation under Illinois law. *Teamsters II*, 762 F.2d at 531–32.

**12.** See Ill.Rev.Stat. ch. 110, ¶ 13–217 as to the possibility of Fund's bringing a state action even now, nearly seven years after the alleged fraud. That provision makes it unnecessary to consider whether federal jurisdiction of the pendent state law claim should (or could) be retained, to avoid Fund's loss of that claim by the running of limitations while this case has wended its way through an appeal and back again.