**TEAMSTERS LOCAL 282 PENSION TRUST FUND, Plaintiff,**

v.

**Anthony G. ANGELOS, et al., Defendants.**

**No. 86 C 3936.**

United States District Court, N.D. Illinois, E.D.

Dec. 9, 1986.

Sherman Carmell, Lisa B. Moss, Carmell, Charone, Widmer & Mathews, Ltd., Chicago, Ill., Edward J. Boyle, Thomas R. Manisero, Michael M. Feigin, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for plaintiff.

John Powers Crowley, Matthew F. Kennelly, Cotsirilos & Crowley, Ltd., Chicago, Ill., Richard B. Gould, Mt. Prospect, Ill., Ira J. Bornstein, Harvey J. Barnett & Assoc., Ltd., Jerome H. Torshen, Abigail K. Spreyer, Jerome H. Torshen, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Teamsters Local 282 Pension Trust Fund ("Fund") sues seven defendants[1] for com-

---

1. Defendants are the law firm of Jenner & Block, which served as legal counsel to Des Plaines Bancorporation, Inc. ("Bancorporation"), and six Bancorporation directors: Antho-ny G. Angelos ("Angelos"), C.J. Bassler, Jonathan T. Howe ("Howe"), Clarence L. Jensen, Lambrose Karkazis and James C. Kirie (collectively "Directors").

mon law fraud.[2] Several defendants now move for summary judgment under Fed.R. Civ.P. ("Rule") 56,[3] contending the present action is barred by principles of issue preclusion—"collateral estoppel."[4] For the reasons stated in this memorandum opinion and order, that motion is granted and the action is dismissed as to all defendants.[5]

### Facts [6]

Early in 1979 Angelos approached Fund's Trustees ("Trustees") seeking a $2 million loan (the "Loan") to Des Plaines Bank ("Bank"), a wholly owned subsidiary of Bancorporation. Bancorporation and Fund quickly reached consensus on the terms of the Loan, signing a loan agreement March 1, 1979. Bancorporation made all payments required under the loan agreement through September 1980, the last payment date before Bank was closed by federal and state regulatory officials March 14, 1981. No payments have been made since then.

In 1981 certain Fund beneficiaries sued Trustees under ERISA, 29 U.S.C. § 1104(a), charging a breach of Trustees' fiduciary duties in connection with the Loan to Bancorporation. In 1982 the Secretary of Labor commenced an action against Trustees, alleging the same breach of duty.[7] Fund was joined as a defendant in each action. After the actions were consolidated for pretrial purposes, Fund and Trustees brought third-party actions in each case against ten of Bancorporation's directors and Jenner & Block, asserting:

1. violation of Securities Act of 1933 ("1933 Act") § 17(a), 15 U.S.C. § 77q(a);

2. violation of Securities Exchange Act of 1934 ("1934 Act") § 10(b), 15 U.S.C. § 78j(b) and related SEC Rule 10b-5;

3. common law fraud; and

4. negligent misrepresentation.[8]

In July 1983 District Judge Jacob Mishler issued his findings and conclusions based upon the evidence adduced during his bench trial, *Katsaros v. Cody*, 568 F.Supp. 360 (E.D.N.Y.1983), *aff'd*, 744 F.2d 270 (2d Cir.1984). Judge Mishler found Trustees had violated their fiduciary duties in making the Loan and held Trustees jointly and severally liable for all losses incurred on account of that breach. In particular Judge Mishler found (*id.* at 367):

1. Trustees violated their fiduciary duty by failing to make an adequate independent investigation of Bancorporation's and Bank's financial situation.

---

**2.** Although at least some of the allegedly fraudulent activity occurred in New York, all the parties have treated Illinois law as controlling. At least given the substantial Illinois nexus of the dispute, that is enough. *National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir.1985).

**3.** See Appendix.

**4.** Though "collateral estoppel" is the more traditional phrase, this Court normally prefers to use "issue preclusion"—among other reasons, "collateral estoppel" is traditionally paired with "res judicata," and the use of that latter term may create mischief because it is frequently employed as a generic term (embracing both claim preclusion and issue preclusion) rather than in the narrower sense of claim preclusion alone. See *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984). This opinion will employ "issue preclusion" from here on out.

**5.** Defendants have also argued for dismissal of Fund's Complaint under Rules 9(b) and

12(b)(6). Because this Court finds their issue preclusion contention persuasive, their other arguments will not be addressed (but see the Appendix as to the choice defendants may have carved out for themselves). One final item: Even though not every defendant has joined in each motion, this opinion is dispositive as to the entire action (and hence as to all defendants).

**6.** This recitation of facts is drawn from the parties' submissions. Of course any inferences to be drawn from the established facts have been viewed in the light most favorable to the nonmovant Fund. *Falconer v. Meehan*, 804 F.2d 72, 74 (7th Cir.1986).

**7.** Both those actions were filed in the United States District Court for the Eastern District of New York.

**8.** Those third party actions were severed from the main cases (Pl. Ex. D), and Fund's claims were eventually dismissed as procedurally inappropriate (Pl. Ex. E).

2. Such duty to make an independent investigation included the duty not to rely on "representations, predictions and hopes" of Bancorporation's directors.

3. Had Trustees made an independent investigation, they would have discovered it was imprudent to make the Loan to Bancorporation and Bank based upon the financial information presented by Bancorporation's directors.

After that adverse determination Fund sued Directors [9] and Jenner & Block in this Court, advancing the same claims set forth in the third party actions before Judge Mishler. This Court held justifiable reliance was an essential element of all four of Fund's causes of action. Consequently this Court decided Directors and Jenner & Block were entitled to judgment as a matter of law because of the issue-preclusive effect of Judge Mishler's determination that Fund had no right to rely on the alleged misrepresentations (585 F.Supp. 1401 (N.D.Ill.1984), *"Teamsters I"*). On appeal that decision was reversed as to Fund's 1933 and 1934 Act claims but affirmed as to Fund's misrepresentation claim (762 F.2d 522 (7th Cir.1985), *"Teamsters II"*).[10] On remand this Court again dismissed (1) Fund's 1933 and 1934 Act claims, this time because those securities law claims were brought after the statute of limitations had run, and (2) Fund's state law fraud claim, because it had been advanced as a pendent claim with no stated independent ground for federal jurisdiction (624 F.Supp. 959 (N.D.Ill.1985), *"Teamsters III"*).

Fund has now refiled its common law fraud action, grounding jurisdiction in diversity of citizenship under 28 U.S.C. § 1332. Defendants have renewed their reliance on *Katsaros* as the basis for summary judgment.

*Illinois Common Law Fraud*

None of us—even appellate judges—comes equipped with an unclouded crystal ball. *Teamsters II,* 762 F.2d at 531 anticipated the survival of Fund's 1933 and 1934 Act claims and hence the likely irrelevance of the common law fraud claim:

> Because we conclude that the securities claims must be resurrected, we need not pass on the adequacy of the claims based on the common law of fraud in Illinois. The Fund does not suggest that it would be entitled to any remedy under Illinois law of fraud that is unavailable under Rule 10b–5, or that its burden of proof on claims of intentional misstatements would be any easier under Illinois law. To the contrary, Illinois law may impose on plaintiffs a slightly greater burden of investigation than we believe the securities laws create.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> We therefore are not persuaded that there is a significant difference between state and federal law here. But we lack the authority to interpret state law with the same freedom we possess in construing federal law, and we shall refrain from harmonizing the state cases unless we are persuaded that it is important to the further conduct of this litigation.

Now this Court is constrained to do the job of "harmonizing the state cases" eschewed by the Court of Appeals, though on analysis no real disharmony in the Illinois cases is really apparent.

In Illinois the elements of a cause of action for fraud are well established. As reaffirmed in *Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) (citations omitted), those elements are:

> (1) false statement of material fact (2) known or believed to be false by the

---

**9.** James Kokonos, James Verros and Herbert Wenske, who were also Bancorporation directors and were third party defendants in the New York actions, were not named as defendants here.

**10.** As the later text discussion reflects, *Teamsters II* remanded the fraud claim along with the securities law claims, but expressly declined to rule on the issue-preclusive effect of Judge Mishler's findings on Fund's fraud claim. Our Court of Appeals' passing dictum on the Illinois law of fraud (762 F.2d at 531)—which does not establish law of the case—has triggered much of the discussion in this opinion.

party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.... Furthermore, the reliance by the other party must be justified, *i.e.,* he must have had a right to rely.

To recover against defendants, Fund would have to establish *each* of those elements at trial by clear and convincing evidence. *National Republic Bank of Chicago v. National Homes Construction Corp.,* 63 Ill. App.3d 920, 924, 21 Ill.Dec. 80, 83, 381 N.E.2d 15, 18 (1st Dist.1978). Defendants address only one of the elements—justifiable reliance. But because each element is a sine qua non for Fund to prevail in this action, defendants' successful attack on that single issue dooms Fund's claim.

*Bowyer v. United States Department of Air Force,* 804 F.2d 428, 430 (7th Cir.1986) (citations omitted) has just repeated long familiar doctrine:

> Summary judgment is properly granted only when no genuine issues exist as to any material facts and the moving party is entitled to judgment as a matter of law.... A [district] court examines the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the party opposing the motion.

Defendants argue the *Katsaros* factual determinations are binding on Fund and conclusively negate Fund's justifiable reliance on defendants' alleged misrepresentations. That contention really involves three separate issues:

> 1. the issue-preclusive effect of Judge Mishler's *factual* determinations;
> 2. what those factual determinations were; and
> 3. the legal effect of those factual determinations on Fund's right to rely under Illinois law.

### Issue Preclusion

■ This Court has already decided the first question: the effect of fact-finding in *Katsaros* (*Teamsters I,* 585 F.Supp. at 1403–05). Its decision in that respect was specifically confirmed on appeal (*Teamsters II,* 762 F.2d at 525–26):

> The application of issue preclusion here means at least that the trustees breached a duty to investigate and that but for the failure to investigate the loss would not have occurred.

See also *Teamsters III,* 624 F.Supp. at 960–61 n. 3. In brief, Fund cannot relitigate the *factual* questions it had a full and fair opportunity to litigate before Judge Mishler and on which Judge Mishler actually and necessarily made a determination.

Fund does not dispute Judge Mishler's having actually and necessarily decided factual issues relevant to the issues in this case. Instead it urges that because the *legal* issues in this dispute are different from those in *Katsaros,* the earlier *factual* determinations are not now binding on Fund. That reflects a total misperception not only of issue preclusion doctrine but of the significance of *Teamsters II* as well.

■ *Falconer,* 804 F.2d at 76 (citations, including one to *Teamsters II,* omitted) explains why Fund is wrong in its basic premise:

> Collateral estoppel is proper ... when facts giving rise to a later cause of action were adversely decided against the plaintiff in a prior action, even if in the prior action a different legal theory was argued ... For if we rejected the use of collateral estoppel in [such a] case and remanded, the district court would merely be deciding the same factual issues that were decided earlier.

*Teamsters II,* 762 F.2d at 526–30 decided Fund's securities law claims were not foreclosed by Judge Mishler's holding that Trustees could not rely on defendants' representations for ERISA purposes—but that was because the *legal standard* defining the right to rely under ERISA is different from the securities laws' *legal standard* of reliance. That points up the relevant distinction here: Issue preclusion does bar a party's right to retry *factual* issues, but their legal effect must then be decided at the next level of inquiry. That was pre-

cisely how *Teamsters II, id.* at 526 posed and then dealt with the issues.

■ Thus Judge Mishler's factual determinations *are* binding on Fund (*id.* and *Teamsters III*, 624 F.Supp. at 960 n. 3). And as the following discussion reflects, those factual determinations are not only material to, but actually prove to be determinative of, the legal question whether Fund justifiably relied on defendants' alleged misrepresentations.

*Judge Mishler's Factual Findings*

*Katsaros*, 568 F.Supp. at 363–69 expressly found:

1. In its fiscal year ended February 28, 1979, Fund had assets of about $58 million, about 80% of which were invested in stocks, bonds and commercial paper.

2. Angelos first approached Trustees about a loan in late January 1979. Then on February 7 Howe wrote to Trustees, formally requesting a $2 million loan. At the end of February Howe and Angelos met with Trustees, and after a two-hour presentation Trustees unanimously approved the Loan, which called for Bancorporation to make semi-annual payments of $125,000 plus accrued interest.

3. At that February 27 meeting Trustees were given Bancorporation and Bank's consolidated financial statements for the previous year. Though a Fund staff accountant attended the meeting, neither he nor any other staff member had enough training to express an opinion on the Loan's soundness.

4. Next day two Trustees traveled to Chicago to close the Loan. They visited Bank and viewed certain vacant real estate owned by Angelos (that real estate was to stand as security for his personal guaranty). They retained local counsel in Chicago to advise them on the Loan documents. After receiving an opinion letter on Bank's condition from Jenner & Block (Bank's counsel), those Trustees closed the Loan the following day (March 1).

5. Had an expert analyzed the financial statements first submitted to Trustees two days (!) before the Loan closing, he or she would have found:

(a) Bancorporation's sole source of income was Bank's earnings.

(b) Bancorporation had only $500,-000 in tangible net worth, even assuming the soundness of Bank's loan portfolio.

(c) Although Bank had reflected a significant earnings increase in 1978, that was due to its portfolio of risky loans, bearing higher than normal interest rates. Bank ranked 149th out of 151 Illinois banks of similar size in terms of its capital adequacy.

(d) Bank's loan loss reserve was about 25% below the minimum figure conservative banking practice would require. Bank's sharp reduction in the percentage of its loss reserve to outstanding loans between 1977 'and 1978 (also about 25%) contributed strongly to the purportedly higher net earnings in 1978.

(e) Bank's net income in 1978 was only $278,000 (even without discounting it for the reasons referred to above), while the Loan obligated it to make annual payments of $250,000 in principal plus over $200,000 in interest. Thus Bank would be totally unable to meet its obligations under the Loan (by a wide margin) if annual earnings continued at the 1978 level.

(f) Though Trustees were told Bank's cash-flow problem was the reason it needed the Loan, the available cash proceeds of the Loan (only $500,-000 of the $2 million principal amount of the Loan) would have only a minimal effect toward alleviating that problem.

(g) Bank's collateral for the Loan was inadequate.[11]

---

11. As security for the Loan, Bancorporation pledged all the outstanding stock of Bank, which Bank's financial statements valued at $2 million. Judge Mishler found it was imprudent of Fund to rely on Bank's own valuation of its stock. 568 F.Supp. at 368.

6. Furthermore, had Trustees undertaken an adequate (or even a minimal) investigation of Bank and the Loan, they would also have learned:

> (a) Angelos' real estate, also pledged as collateral for the Loan, was substantially overvalued.[12]

> (b) Bank owed $1 million to Central National Bank falling due March 1, 1979 (thus the rush to close the Loan by that date).[13] Central National had refused renewal.

> (c) At least five other banks in the Chicago area had also refused to refinance the Central National loan.

Trustees' inquiry could also reasonably have led them to learn FDIC had recently prepared a report highlighting the Bank's undercapitalization, its loan-deposit ratio and its high percentage of both substandard loans and restaurant loans.

As already stated, Fund is bound by those findings—it cannot relitigate them.

Based on those extensive factual findings, Judge Mishler found Trustees had violated their fiduciary duties under ERISA by relying on defendants' representations. This opinion need not (at least at this point) essay a matching of the reasonable reliance standard under ERISA with the corresponding standard under common law fraud (although it should be emphasized both Judge Mishler, 568 F.Supp. at 366, 369 and the Second Circuit in affirming him, 744 F.2d at 279 applied "the objective 'prudent person' standard developed in the common law of trusts"). Instead the issue-preclusion question is a more direct one: whether the factual findings that led to Judge Mishler's legal conclusion (factual findings that are binding on Trustee) also establish, as a matter of law, the absence of Fund's reasonable reliance on defendants' alleged misrepresentations for purposes of the present fraud claims. Cf. *Falconer*, 804 F.2d at 76.

■ Fund attempts to prevent this Court from now deciding that question—Fund's right to rely—by arguing material factual disputes exist on that score. But Fund fails to specify any such factual disputes that were not already resolved in *Katsaros*.[14] Because the following discussion of the Illinois law of justifiable reliance clearly shows Judge Mishler has already made all the factual determinations relevant to the right-to-rely issue, all that remains is for this Court to apply those factual determinations to the law,[15] a situation perfectly

---

**12.** In addition to Bank's stock, Fund required Angelos to guarantee the Loan personally and to pledge certain unimproved real estate as security for that guarantee. Angelos claimed his 63% interest in that real estate to be worth $1,386,000. In fact it was worth only $252,000. 568 F.Supp. at 368–69. Indeed, on the very day the Loan was closed the property was seized and sold for delinquent taxes (*id.* at 369).

**13.** Although Judge Mishler did not expressly include this in his findings, Fund's Complaint ¶ 20 admits it was aware Bank was already indebted and a substantial portion of Fund's Loan would be used to pay those debts. Central National's $1 million was the largest of those debts, but the others accounted for nearly another $500,000. See also *Katsaros*, 568 F.Supp. at 364–65.

**14.** Fund correctly points out (a) Judge Mishler found only that it "could ... reasonably" have discovered FDIC's report had Fund tried to do so (568 F.Supp. at 369) and (b) in fact the report was confidential. Even were those facts to leave some room for further factual inquiry in that area alone, in the view taken by this Court's analysis no *material* fact issue is posed by that possibility. As the text discussion will reflect, this opinion has wholly omitted the FDIC report from its discussion of what Fund could have learned had it conducted an adequate investigation. In light of the vast amount of other adverse information Fund could have obtained, the absence of the FDIC report is not at all important—it certainly does not pose "a genuine issue as to any material fact" (Rule 56(c)).

**15.** Fund also argues one "factual" dispute remains unresolved: the question whether Fund in fact had a right to rely. Fund cites *Duhl v. Nash Realty, Inc.*, 102 Ill.App.3d 483, 57 Ill.Dec. 904, 911, 429 N.E.2d 1267, 1274 (1st Dist.1981) for that proposition. Unfortunately Fund's reliance on *Duhl* is as unjustified as was its original reliance on the alleged misrepresentations when it made the Loan. *Duhl* simply repeats the truism that legal questions are given to the jury when factual disputes relevant to those legal questions remain for the jury to resolve. But when (as here) all underlying factual disputes have been resolved, this Court can itself apply the law to those facts, to determine wheth-

suited for disposition by summary judgment.

### Fund's Right To Rely

Fund argues a party alleging fraud loses its right to rely *only* when that party in fact undertakes to investigate any alleged misrepresentations and discovers the truth (or at least discovers a substantial likelihood that the representations are false), then nevertheless closes its eyes. In fairness to Fund, that is how the dictum in *Teamsters II,* 762 F.2d at 531 characterized Illinois law (though the Court of Appeals there cited back not to the recent Illinois cases themselves, but to an earlier Court of Appeals decision parsing still earlier Illinois cases, *Peterson Industries v. Lake View Trust & Savings Bank,* 584 F.2d 166, 168–69 (7th Cir.1978) (per curiam)).

 With all due respect to our Court of Appeals' dictum in *Teamsters II, Peterson* expressed a plaintiff's undertaking of an investigation, plus its resulting knowledge, as a sufficient but *not* as a necessary condition to that plaintiff's lack of right to rely. Such a narrow limitation on the right to rely would allow parties, under most circumstances, simply not to investigate or to investigate poorly. Then, so long as they did not actually discover anything to discredit representations made to them, they could rely on those representations and later sue for fraud if the representations proved false. Illinois case law clearly rejects any such approach or result—and under *Erie v. Tompkins* it is what the Illinois courts have done, and not what federal courts may have said on the subject in the past, that controls.

*Central States Joint Board v. Continental Assurance Co.,* 117 Ill.App.3d 600, 606–07, 73 Ill.Dec. 107, 111–12, 453 N.E.2d 932, 936–37 (1st Dist.1983) (citations omitted) has recently synthesized the Illinois case law in this area:

> A review of case law involving misrepresentation and concealment, which constitutes fraud, shows that the court must

be convinced that the injured party had justifiably relied on defendant's words or silence, and that the right to rely depends upon all of the surrounding circumstances.... Generally, it is only where parties do not have equal knowledge or means of obtaining knowledge of the facts which are misrepresented that a person may justifiably rely on them. A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another....

 \* \* \* \* \* \*

Although we are mindful that plaintiff's negligence is not generally a defense for an action in fraud, there are situations where, as here, plaintiff has an obligation to inquire.... In determining whether reliance was reasonable, all the facts which plaintiff had actual knowledge of, as well as all of those it might have learned if it had used ordinary prudence, must be taken into account; if ample opportunity existed to discover the truth, then reliance is not justified.

In *Central States* just such an obligation to inquire, and the risks of a failure to do so, were thrust on a pension plan exactly like Fund here.

In sum, Illinois law as to the reasonableness of reliance is much like the "ostrich" instruction employed by courts in this Seventh Circuit in defining "knowledge" in criminal cases. See *United States v. Ramsey,* 785 F.2d 184, 190 & n. \* (7th Cir.1986). In a criminal case, of course, there is no such thing as a directed guilty verdict. But when in a civil case *all* the relevant facts are established (that is the effect of *Katsaros* on this action) and can lead to only one legal conclusion, nothing remains for the trier of fact to resolve. It becomes purely a question of law for the court.

 In the determination of a plaintiff's right (or lack of right) to rely, a variety of factors are relevant. Information in plaintiff's possession that should have put it on inquiry is an important

er Fund had a right to rely as a matter of law.

See *Peterson,* 584 F.2d at 168.

factor. *National Republic Bank*, 63 Ill. App.3d at 925, 21 Ill.Dec. at 84, 381 N.E.2d at 19. Ease of access to outside information and relative sophistication of the parties are also relevant. *Peterson*, 584 F.2d at 169 and cases cited. Though there might perhaps be permissible reliance on a statement "if the party making the statement creates a false sense of security or blocks further inquiry," the court must determine whether the facts were such as to put a reasonable person on inquiry. *Marino v. United Bank of Illinois, N.A.*, 137 Ill.App.3d 523, 527, 92 Ill.Dec. 204, 208, 484 N.E.2d 935, 938 (2d Dist.1985). Even a party's representation by an attorney does not alone justify reliance. *Schmidt v. Landfield*, 23 Ill.App.2d 55, 59, 161 N.E.2d 702, 704 (1st Dist.1959).

■ True enough, many of the cases examining a plaintiff's right to rely involved situations where plaintiff did undertake an investigation but did so poorly (as *Teamsters II* suggests), but the principles stated in those cases clearly apply as well to situations where a plaintiff should have investigated but simply failed to do so. See, e.g., *North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.*, 583 F.Supp. 691, 697–98 (N.D.Ill.1984). All of this is no more than a specialized version, attuned to fraud cases, of the long-established Illinois concept of "inquiry notice" exemplified by *Smith v. Grubb*, 402 Ill. 451, 464–65, 84 N.E.2d 421, 428 (1949):

> One having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts he might have discovered by diligent inquiry. Whatever is notice enough to excite the attention of a prudent man and put him on his guard is notice of everything to which such inquiry might have led and every unusual circumstance is a ground of suspicion and demands investigation.

And it must be stressed once again that Judge Mishler's determinations were spe-cifically expressed in terms of what Trustees—as "prudent men"—were duty-bound to inquire into, given the facts known to them.

This discussion has perhaps been needlessly protracted. But for the en passant (and, with all respect, inaccurate) dictum in *Teamsters II*, 762 F.2d at 531, it should have been enough for this Court to point to two conclusive factors:

1. what *Central States*, 117 Ill. App.3d at 607, 73 Ill.Dec. at 112, 453 N.E.2d at 937 described as controlling as to reasonable reliance:

> all of those [facts a plaintiff] might have learned if it had used ordinary prudence ...; if ample opportunity existed to discover the truth, then reliance is not justified.

2. what *Katsaros* held Fund *would have* (not merely "might have") learned "if it had used ordinary prudence" (the precise standard employed by Judge Mishler).

It is hardly necessary to rehash Judge Mishler's findings in that latter respect, all of which are relevant (even omitting the one as to the FDIC report, see n. 14) and all of which point in a single direction. This paragraph's highlighting of a few facts should not therefore be misunderstood as the limit of this Court's reliance on those findings to support the unquestionable lack of Trustees' right simply to rely on what they were told. Suffice it to say Fund and Trustees were major sophisticated investors (Fund's portfolio of $58 million was many, many times Bancorporation's entire value [16]). Yet Fund invested some 3½% of its entire portfolio on the strength of a brief presentation and the sketchiest of inquiries, without availing itself of expert advice or making the most minimal investigation—an investigation that under the circumstances would immediately have divulged facts compelling any reasonable person to inquire further.

In the totality of the circumstances found by Judge Mishler, it cannot be gain-

---

**16.** Bancorporation's net worth in 1978 was $1.8 million, but that included goodwill valued at $1.3 million. *Katsaros*, 568 F.Supp. at 367.

said that Trustees, or an expert retained by them, should have examined the financial statements Directors provided to Fund and, upon minimal analysis and investigation, should have discovered Bank's precarious financial situation (568 F.Supp. at 367–68). That alone would have revealed Directors' alleged statements were in fact not true. At the very least it would have compelled Trustees to inquire further before lending Bancorporation $2 million. Even minimal further inquiry would have revealed a great deal of additional and conclusive evidence as to the riskiness of the Loan (*id.*).

Indeed, several Trustees did in fact undertake an "investigation"—but an inadequate one. They simply visited Bank, eyeballed some vacant real estate that was security for Angelos' guaranty of the Loan, and hired local counsel in Chicago (*id.* at 364). Those Trustees even insisted on getting an opinion letter from Jenner & Block [17] and obtaining Angelos' personal guaranty. Why did they stop there, given the inquiry-provoking nature of what they already knew?

Judge Mishler did find the entire transaction was designed to discourage inquiry into the merits of the Loan (568 F.Supp. at 367). But even viewed most favorably to Trustees, that conduct cannot be found to have created a false sense of security or to have prevented Trustees from inquiring further. If anything such conduct should have encouraged them to inquire further, and—what controls here—Judge Mishler held they were duty bound to do so.

█ All that alone—without the benefit of further determinations made by Judge Mishler—would command the result reached in this opinion. But there is more. Issue preclusion extends not only to specific factual (that is, evidentiary) findings made in an earlier proceeding but also (as the very name implies) to *issues* decided in those proceedings. And in this instance the issues decided by Judge Mishler included a definition of the standard of care imposed on Trustees—a highly relevant

factor in determining the scope of their duty of inquiry.

Indeed, this opinion has already said Illinois law specifically considers an allegedly defrauded plaintiff's "sophistication" when determining that plaintiff's right to rely on a defendant's representations. *Peterson*, 584 F.2d at 169 and cases cited. In other words, Illinois does not look to Everyman (the hypothetical "reasonable person" in the abstract), but does take into account the particular plaintiff's attributes in defining its right to rely and its correlative duty to inquire.

In this context, Trustees' position as trustees, and the consequences of that position, are just as relevant as the size of Fund's assets. Judge Mishler expressly found Trustees had a duty to investigate before approving the Loan. *Katsaros*, 568 F.Supp. at 367. Although their nonperformance of that duty did not bar Fund's claims under the 1933 and 1934 Acts (*Teamsters II*, 762 F.2d at 526–30), that was attributable to the special solicitude the federal securities laws evince for investors, coupled with the Court of Appeals' judgment that different standards of securities laws liability should not be applied because of individual differences among members of the investing public.

That line of analysis does not extend to Illinois common law fraud, where such individual differences *do* make for differences in the existence and scope of a duty to investigate; *cf. Parker v. Arthur Murray, Inc.*, 10 Ill.App.3d 1000, 1004, 295 N.E.2d 487, 490 (1st Dist.1973). Thus the failure of a sophisticated plaintiff to investigate has been held to bar that plaintiff from recovering from a defendant who allegedly defrauded the plaintiff; see, e.g., *Central States*, 117 Ill.App.3d at 606–07, 73 Ill.Dec. at 112, 453 N.E.2d at 937; *National Republic Bank*, 63 Ill.App.3d at 924–25, 21 Ill.Dec. at 84, 381 N.E.2d at 19.

Here the level of Trustees' required conduct is dictated by law. Judge Mishler found that under the common-law "prudent person" rule incorporated by ERISA (*Kat-*

---

**17.** Fund can hardly argue it could justifiably rely on the opinion letter of its borrower's legal counsel. In any case, the opinion letter was just that—an opinion.

*saros,* 568 F.Supp. at 367) (citations omitted):

> The conduct of a trustee in making an independent investigation is an indication of the care and diligence of the trustee in arriving at an investment decision. A trustee unfamiliar with an unusual or difficult investment decision is charged with making "an independent inquiry into the merits of particular investments rather than [relying] wholly upon the advice of others." ... A trustee's duty to make an independent investigation includes the negative obligation of not relying on the representations, predictions and hopes of a borrower.

That determination (specifically affirmed by the Second Circuit, 744 F.2d at 279–80) is itself issue-preclusive (that is, it cannot be relitigated by Fund), and it is just as binding on Fund in the present context as if an Illinois court (which also employs the "prudent person" standard) had defined Fund's duty to investigate, or as if an Illinois statute had prescribed the standard of conduct mandated for trustees. Fund simply cannot argue it had a right to rely on defendants' representations without inquiry, because Judge Mishler has already determined Fund had a legal obligation to inquire. Again it should be stressed this is an independent basis for rejecting Fund's claim of reliance—the same result would obtain even without reference to Judge Mishler's just-quoted ruling.

There is no need to labor the matter further. On the facts found in *Katsaros* and binding on Fund here, it clearly had no right—as a matter of law—to rely on defendants' alleged misrepresentations. And independently, on the legal standard announced in *Katsaros* and equally binding on Fund here, the same conclusion is compelled as a matter of law.

### Conclusion

There is no dispute as to any fact material to the question of Fund's right to rely on the alleged misrepresentations of defendants. Those facts were determined by Judge Mishler in earlier litigation, and issue preclusion principles bar Fund from disputing them here. Under Illinois' common law of fraud, Judge Mishler's factual determinations establish—as a matter of law—Fund's lack of right to rely on defendants' alleged misrepresentations. Independently, Judge Mishler's legal-standard determination, also issue preclusive as to Fund, bars Fund's claim of justifiable reliance.

Because justifiable reliance is an essential element of a cause of action for fraud, defendants are entitled (twice over) to a judgment as a matter of law. This action is dismissed.

### APPENDIX

There is something quite troublesome about the use of a summary judgment motion in the present context—one that challenges a single ingredient of a cause of action, even though the absence of that ingredient is potentially dispositive. Summary judgment is intended to be a substitute for trial or, more accurately, a determination no evidentiary trial is necessary because material factual disputes are absent. *American Floral Services, Inc. v. Florists' Transworld Delivery Association,* 633 F.Supp. 201, 225 (N.D.Ill.1986). If a party goes to trial and loses, there is no opportunity for a second trial to advance evidence or issues that could have been but were not put forth at trial. *Factofrance Heller v. I.P.M. Precision Machinery Co.,* 627 F.Supp. 1412, 1416 (N.D.Ill.1986). And so it has become well established that the *opponent* of a Rule 56 motion cannot "hold back" evidence—if the motion is lost, there is no second chance. *Publishers Resource, Inc. v. Walker Davis Publications,* 762 F.2d 557, 561 (7th Cir.1985), quoting this Court's opinion in *Keene Corp. v. International Fidelity Insurance Co.,* 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd and adopted,* 736 F.2d 388, 393 (7th Cir.1984).

But the risk to a Rule 56 *movant* who holds back (in the sense of addressing fewer than all the factual issues) and is unsuccessful is not well defined. See *Green v. Silver Cross Hospital,* 606 F.Supp. 87, 88–89 (N.D.Ill.1984). Because the issue now put to this Court does dispose of plaintiff's claim once defendants succeed on it, this is not an instance of a party's impermissible

attempted use of Rule 56 as issue-narrowing rather than claim-dispositive. *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 508–09 (N.D.Ill.1985) and cases cited, particularly this Court's opinion in *SFM Corp. v. Sundstrand Corp.,* 102 F.R.D. 555, 558–59 (N.D.Ill.1984) and Judge Getzendanner's in *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25 (N.D.Ill.1985). And because it turns out defendants *do* win, this Court need not decide whether they had staked everything on a single throw had they lost (the issue this Court identified but did not have to resolve in *Green* ). Nor is it necessary now to decide whether that issue is affected by defendants' simultaneous tender of pleading motions under Rules 9(b) and 12(b)(6). All the same, if the Court of Appeals were to disagree with this opinion's application of issue-preclusion doctrine, the all-or-nothing question identified in *Green* may have to be decided by that court or this one (or perhaps by one of this Court's colleagues).