NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,
PA., Plaintiff,

v.

CONTINENTAL ILLINOIS
CORPORATION, et al.,
Defendants.

HARBOR INSURANCE COMPANY and
Allstate Insurance Company, Plaintiffs,

v.

CONTINENTAL ILLINOIS
CORPORATION, et al.,
Defendants.

Nos. 85 C 7080, 85 C 7081.

United States District Court,
N.D. Illinois, E.D.

April 24, 1987.

See also 658 F.Supp. 781.

James G. Hiering, Dennis C. Waldon, A. Benjamin Goldgar, Jeffrey I. Berkowitz, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

Roger W. Barrett, Franklin P. Auwarter, Michele Odorizzi, Mayer, Brown & Platt, Gary L. Prior, Kevin T. Keating, McDermott, Will & Emery, Chicago, Ill., for defendants.

MEMORANDUM OPINION
AND ORDER

SHADUR, District Judge.

Harbor Insurance Company ("Harbor"), Allstate Insurance Company ("Allstate")

and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively "Insurers") have sued Continental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank")[1] and a host of other defendants, seeking to avoid liability under the directors' and officers' ("D & O") liability policies (the "Policies") Insurers had issued to CIC.[2] In response to an $88 million counterclaim filed by Federal Deposit Insurance Corporation ("FDIC," 113 F.R.D. 527), Insurers have filed a counterclaim ("Insurers' Counterclaim") against Continental and various individuals.[3]

Now Continental and the "Individual Defendants"[4] have moved to dismiss Insurers' Counterclaim under Fed.R.Civ.P. ("Rule") 12(b)(6). For the reasons stated in this memorandum opinion and order, their motion is granted.

### Insurers' Counterclaim

Insurers' Counterclaim seeks to recover from Continental and the Individual Defendants whatever amounts Insurers *may* have to pay (1) to FDIC on its counterclaim and (2) to Continental on its counterclaim for defense costs in the underlying securities litigation (see the Fourteenth Opinion, 652 F.Supp. 858, 863–65). Insurers' asserted basis for that recovery is fraud on the part of its now-targeted Counterclaim defendants.

Given the contingent nature of Insurers' Counterclaim, it is really a claim for indemnification under Rule 14, whose express language allows such claims to be made only against third parties. Nonetheless, as just explained in the contemporaneously-issued Eighteenth Opinion, 658 F.Supp. 781, 794, this Court (like numerous others) will stretch Rule 14 to allow a contingent claim for indemnification against an adverse party. Insurers' Counterclaim therefore satisfies Article III's "case or controversy" requirement, because it seeks indemnification for amounts Insurers may have to pay on claims already pending in these actions.

Insurers' Counterclaim contains a confusing mixture of allegations incorporated wholesale from Insurers' Complaints and from FDIC's Counterclaim ¶ 2.[5] Moreover, 16 of the 24 allegations in Insurers' fraud claim are directed *exclusively* at Ernst & Whinney, Continental's independent accountants and auditors. Defendants are brought into the picture via IC ¶¶ 14 and

---

**1.** CIC and Bank are collectively called "Continental."

**2.** Because this Court has typically begun all its opinions in these cases with the same opening description, some means of early differentiation is useful. Solely for that purpose, it is noted this is this Court's nineteenth written opinion since the cases were assigned to its calendar after a series of recusals by other judges of this District Court. For the same ease in reference, earlier opinions will also be cited by number.

**3.** Insurers initially filed a two-count counterclaim. This Court's January 12, 1987 Seventeenth Opinion, 654 F.Supp. 316, dismissed the second count, which had sought relief for negligent misrepresentation, before defendants' present motion was fully briefed. All references to the remaining Insurers' Counterclaim allegations will take the form "IC ¶ —." As in earlier opinions, all references to Insurers' Complaints will take the form "H–A ¶ —" and "NU ¶ —." Because this Court recently sent Insurers back to the drawing board on their Amended Complaints, this opinion will not refer to the allegations in those pleadings.

**4.** Roger Anderson, George Baker, Gerald Bergman, Edwin Hlavka, John Lytle, Donald Miller, John Perkins, Richard Rastetter and John Redding—fewer than all the individuals named as defendants in Insurers' Complaints—are labeled "Individual Defendants" in Insurers' Counterclaim. That label creates a risk of confusion with earlier pleadings and opinions in these actions, which have used the same defined term to describe a larger group. Even so, because Insurers' Counterclaim becomes a fleeting memory as the result of this opinion, the parties' usage will be followed in this one instance.

**5.** Insurers' Mem. 4 n. 2 explains Insurers intended only to incorporate the existence of FDIC's Counterclaim and not its specific allegations. That may be a good college try at post hoc rationalization, but it is not at all what IC ¶ 2 says:

> In Counts I and II of the FDIC's counterclaim herein, the contents of which are hereby incorporated by reference, ...

24, which allege (in identical language![6]): [CIC], the Bank and the Individual Defendants, in addition to all their other wrongdoing alleged in the plaintiffs' Amended Complaints, knew or recklessly disregarded the facts alleged in this Count I, and/or knowingly or recklessly participated in and/or approved of the conduct alleged in this Count I.

IC ¶ 17 then lumps Continental and the Individual Defendants with Ernst and Whinney in the alleged fraudulent inducement of the Policies.

Essentially Insurers allege Ernst & Whinney, Continental and Individual Defendants intentionally defrauded Insurers by concealing Continental's true financial condition and by preparing and issuing false financial statements for CIC in 1980, 1981, 1982 and 1983. Insurers claim such fraud (1) caused them to issue the Policies in 1981 and not to cancel the Policies in later years and also (2) caused the underlying securities litigation, which is the source of FDIC's and Continental's counterclaims against Insurers. Insurers contend Continental and Individual Defendants should indemnify Insurers for any amounts they must pay to FDIC and Continental on their counterclaims.[7] In response, Insurers' Counterclaim targets argue Insurers have failed to state a claim upon which relief may be granted. They are right.

### Pleading Problems

■ Although Continental and Individual Defendants have premised their motion on Rule 12(b)(6), they have hedged their bets and also argued Insurers' Counterclaim fails to satisfy interacting Rules 8 and 9(b).

Not much is needed to meet the demands of the former (*Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted)):

"a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

But Rule 9(b) imposes more stringent standards:

In all averments of fraud and mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

Insurers' Counterclaim does something difficult: It runs afoul of both rules.

Insurers' wholesale incorporation of voluminous allegations from their own earlier pleadings[8] makes it difficult to say they have provided their adversaries and this Court with either a "short"[9] or, more importantly, a "plain" statement of their claim. Each of Insurers' Complaints contains over 175 paragraphs, most of which they have incorporated into their new Counterclaim. At least one of the essential elements of a fraud claim—reliance—is not fully stated in the Counterclaim's own allegations, but is buried in those incorporated allegations. Even though IC ¶¶ 15 and 16 do allege Insurers' detrimental reliance by issuing the Policies, no allegations whatever appear in the Counterclaim itself as to Insurers' later reliance by not cancelling the Policies (the only conduct that would arguably make relevant the alleged *post*-issuance conduct that fills up much of Insurers' Counterclaim). Such necessary

---

**6.** It does not inspire a great deal of confidence in the care and thought given the matter by Insurers' counsel when the reader encounters, with no apparent reason and no suggested justification, a verbatim repetition of such an allegation twice in a single count.

**7.** Despite its apparent primary focus on the conduct of Ernst & Whinney, Insurers' Counterclaim does not name the accountants as a counterclaim defendant. Instead Insurers have recently filed a third-party claim against Ernst & Whinney. Its validity is a separate question not discussed in this opinion.

**8.** IC ¶ I "reallege[s] and incorporate[s] by reference" all the allegations from Counts I, III, VI and VII of their Complaints.

**9.** In fairness, "short" must necessarily be a relative term, one as to which a litigant cannot be faulted for drafting a complaint made longer by the need to deal with complex facts. This Court does not favor the increasing tendency of some courts to demand a return to fact pleading rather than the notice-pleading approach that informed the Rules' draftsmen. Nevertheless it has never stricken a pleading for its mere length (as contrasted with, say, a pleading's confused and confusing prolixity).

allegations appear only in H–A ¶ 88 and NU ¶ 86.

More importantly, Insurers' Memorandum on the current motion asserts a quite different claim from that advanced in their actual Counterclaim. IC ¶ 26 alleges:

> By reason of all the foregoing, [CIC], the Bank and the Individual Defendants are liable to plaintiffs for all payments plaintiffs have made, including in excess of $3.5 million conditionally advanced by Harbor, and for all payments made [sic] by plaintiffs as a result of the FDIC counterclaim.

But Insurers' Mem. 8 "indicates":

> [P]laintiffs do not seek money damages from any insureds who are found to be covered under the Policies. Rather plaintiffs seek to recover only from E & W (sic—see n. 7) and those insureds, including Continental, who are excluded from coverage for either breach of cooperation or under various policy provisions.

That is not at all the same. As Continental and Individual Defendants point out, when Insurers want to allege recovery only from persons not covered by the Policies they know how to do it (see H–A ¶ 161 and NU ¶ 156). Their failure to do so in their Counterclaim is unexplained.[10]

That omission is especially relevant for Rule 9(b) purposes. In an effort to satisfy that Rule's "particularity" requirement, Insurers point to the allegations incorporated from their Complaints. To be sure, those allegations do contain numerous references to specific instances of fraud, but they don't differentiate among the various defendants. What Rule 9(b) requires of any plaintiff seeking to impose damages on more than one defendant is—at the very least—a specification of which fraudulent acts were committed by which defendants.[11] Insurers' only attempted response is to point to certain of their interrogatory answers. Just how discovery responses can cure threshold pleading defects is another unexplained mystery—and moreover, even the interrogatory answers similarly fail to differentiate among defendants.

Insurers' pleading defects would alone be enough to call for dismissal of Insurers' Counterclaim. That, however, would simply generate another paper blizzard—a refiled counterclaim and renewed dismissal motions. To avoid that inevitable result, this opinion will pass the pleading flaws and examine the merits of Insurers' new claim.

### Failure To State a Claim

Insurers' Counterclaim divides itself into two parts:

1. Insurers allege Continental and Individual Defendants induced Insurers to issue the Policies by giving Insurers fraudulent financial information (the "pre-issuance fraud").

2. Insurers allege (via the incorporation-by-reference route) the Policies remained in force (that is, were not cancelled) because Continental's true financial condition continued to be concealed after Insurers had issued the Policies (the "post-issuance fraud").

Those same fraudulent acts (both the pre- and post-issuance fraud) allegedly caused the underlying securities litigation, which has resulted in Continental's and FDIC's counterclaims against Insurers.

Insurers' pre-issuance fraud (fraud in the inducement) allegations fail to state a claim because of Illinois Insurance Code § 154 ("Section 154"), Ill.Rev.Stat. ch. 73, ¶ 766. One of the six elements of an Illinois-law fraud claim is justifiable reliance (see *Teamsters Local 282 Pension Trust Fund v. Angelos,* 649 F.Supp. 1242, 1245–

---

10. Also unexplained is Insurers' Mem. 5 assertion that Allstate's position in these lawsuits is different from that of Harbor. That contention belonged in Insurers' earlier memorandum defending their proposed Amended Complaints, for it was there Insurers for the first time stated a distinction between Allstate and Harbor vis-a-vis all defendants. Insurers' earlier memorandum was totally uninformative on that score (see Eighteenth Opinion, 658 F.Supp. at 790 & n. 15).

11. To the extent Insurers attempt to hold any defendants liable for fraud attributable to conduct of Ernst & Whinney, Insurers should also have made specific allegations as to the relationship that would support such vicarious liability.

46 (N.D.Ill.1986).[12] Section 154 defines the information on which an insurer legally (and therefore justifiably) can rely when issuing a policy. And as the Eighteenth Opinion, 658 F.Supp. at 787–88 held, Section 154 applies to D & O liability insurance.

Section 154 specifically says no misrepresentation by the insured can "defeat or avoid" an insurance policy unless it appears in the policy itself or in documents physically attached to the policy. Insurers cannot avoid Section 154 by alleging fraud in the inducement. *Inter-Insurance Exchange of Chicago Motor Club v. Milwaukee Mutual Insurance Co.*, 61 Ill.App.3d 928, 931–32, 18 Ill.Dec. 927, 929–30, 378 N.E.2d 391, 393–94 (3d Dist.1978), followed in *National Fidelity Life Insurance Co. v. Karaganis*, 811 F.2d 357, 365 (7th Cir. 1987). Insurers' Counterclaims (and their Complaints) say nothing about the alleged misrepresentations having been attached to the Policies. That is fatal to Insurers' claim based on pre-issuance fraud.

Insurers argue Section 154 is inapplicable because their Counterclaim asks damages rather than rescission of the Policies. They say they are not attempting to "defeat or avoid" the Policies. That is a distinction without a difference. If Insurers' Counterclaim were successful, defendants in these actions (because not covered by the Policies) would have to indemnify Insurers for all amounts Insurers had to pay under the Policies. Insurers would thus effectively "avoid" all liability under the Policies—a total "defeat" of the Policies and their purposes.

Just as in *Inter-Insurance Exchange*, 61 Ill.App.3d at 932, 18 Ill.Dec. at 930, 378 N.E.2d at 394, Continental's and Individual Defendants' claimed conduct is precisely the kind of misrepresentation to which Section 154 was designed to apply. Insurers cannot dodge Section 154 simply by seeking damages instead of rescission (cf. *National Union Fire Insurance v. Seafirst Corp.*, 662 F.Supp. 36, 39–40 (W.D.Wash. 1986)[13]). They will not be heard to say they relied upon Continental's 1980 financial statements when issuing the Policies, for Section 154 negates any legal right to rely unless those statements were physically attached to the Policies. Again it cannot be overemphasized Insurers were the masters of their own destinies: *They* drafted their Policies, and *they* prescribed what documents were and were not attached to their Policies and hence within the scope of their justifiable reliance.

■ This opinion turns, then, to the post-issuance fraud claim. At least in part, Insurers are lacking another element of a valid cause of action for fraud: causation (see n. 12). They cannot recover unless they sustained damages caused by their reliance on the post-issuance fraud. But based on the terms of the Policies and on Insurers' own allegations in these actions, they would have been exposed to at least partial liability on the Continental and FDIC counterclaims even if each Insurer had cancelled its Policy the day after its issuance.[14] That proposition, though unim-

---

**12.** Those six elements are (*Teamsters*, 649 F.Supp. at 1245–46 (citations omitted)):
(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.... Furthermore, the reliance by the other party must be justified, *i.e.,* he must have had a right to rely.

**13.** In *Seafirst* the plaintiff insurer (one of the plaintiffs in these cases) sought to escape a Washington state statute, also applicable to actions "to defeat or avoid the [insurance] contract." With a keen eye for word meanings (or perhaps a talent for understatement), Judge

Barbara Rothstein labeled National Union's similar effort to differentiate between an action for rescission and an action for damages as "specious" (*Seafirst*, at 40). Interestingly, *Seafirst* also involves the settlement by a bank of claims of bank and bank officers-director misconduct in connection with loans later embroiled in the Penn Square debacle, with D & O insurer National Union seeking to escape its multimillion dollar liability in that case based on the same claims as here (fraudulent misrepresentations in the policy application, breach of the duty of cooperation, and so on).

**14.** Harbor issued its Policy September 2, 1981 (H–A ¶ 38). Allstate's policy was issued September 9, 1981 (H–A ¶ 39). National Union issued

peachable, requires some analysis of the Policies.

Each Policy covers CIC and all individual defendants in the principal action for claims made while the Policy is in force. Under Clause 8(b) of each Policy, the Insurer involved could have cancelled the Policy at any time for any reason upon 30 days' notice to the insureds. But under Clause 8(a) the insureds could then have extended the Policy for 12 months after the effective date of any cancellation to provide coverage for pre-cancellation conduct.

On the most favorable pro-Insurer assumption—its reliance on a misrepresentation as to Continental's "true" financial condition immediately after issuance of the Policy, followed immediately by notice to CIC of the intended Policy cancellation— CIC could have exercised its clause 8(a) option to keep the Policy in force for an additional 12 months (at least as to conduct occurring before Insurer's cancellation notice). Thus Harbor and Allstate could not have completely cancelled their Policies before October 1982, and National Union's Policy would have remained in force until at least January 1983.

Several of the cases in the underlying securities litigation were filed (triggering coverage under the Policies' "claims made" provisions) before October 1982, including *Goodman v. Continental Illinois Corp.*, Master File No. 82 C 4712, which is the source of FDIC's counterclaim.[15] Each Insurer would therefore face potential liability under its Policy on those claims, at least to the extent the claims are based on conduct occurring before the Insurer's opportunity to cancel its Policy. And as already explained, even on a *worst*-case basis that would cover all pre-Policy-issuance conduct.[16] By definition, any alleged post-issuance fraud could not be a "but for" cause of that potential liability.

All that, however, would not defeat Insurers' Counterclaim in its entirety. Instead the Counterclaim's final death warrant is sealed by the very nature of Insurers' claim: one to sue their own insureds for indemnity. Illinois (like most if not all other jurisdictions) holds an insurer does not have a direct right to indemnity against a wrongdoer who has caused an insured's injury. Instead an insurer's only right is derivative as the subrogee of its insured. *Rock Island Bank v. Aetna Casualty and Surety Co.*, 692 F.2d 1100, 1106–07 (7th Cir.1982), citing *Great American Insurance Co. v. United States*, 575 F.2d 1031, 1033–35 (2d Cir.1978). In Illinois an insurer therefore cannot sue its own insured via subrogation. *Western States Mutual Insurance Co. v. Standard Mutual Insurance Co.*, 26 Ill.App.2d 378, 386–87, 167 N.E.2d 833, 837–38 (2d Dist.1960); see also 6A Appleman, *Insurance Law and Practice* § 4055, at 146 (1972):

> Subrogation cannot be obtained against another insured under the same policy, even if such protection is indirect.

Continental and Individual Defendants are specifically named as "Insureds" under the Policies (see Policy Clauses 1 and 2(A)). Such "Insured" status of an officer or director is not altered by the possibility of noncoverage for a particular claim. Insurers therefore have no right to subrogation against an individual "Insured" not covered for a particular claim, even if that Insured were responsible for the claim made

---

its identical policy December 22, 1981 (NU ¶ 37).

**15.** *Goodman* is the consolidation of several cases, filed July 29, August 4, August 8 and September 7, 1982. Those complaints seek relief for allegedly fraudulent conduct by various individual defendants beginning February 15, 1981. Continental's counterclaim for reimbursement of the legal fees for which it provides indemnification to those individual defendants stems from all the underlying securities litigation, including that begun in 1982 (see H–A ¶ 89 and NU ¶ 87 for a summary of that litigation).

It may parenthetically be noted Insurers admit having received prompt notification of the claims, as required by the Policies (H–A ¶ 92, NU ¶ 90).

**16.** For example, if Harbor cancelled its Policy effective October 2, 1981 (30 days after it issued its Policy), Harbor would still be liable on claims made against the insureds before October 2, 1982 to the extent those claims seek damages for conduct occurring before October 2, 1981.

against another "Insured" who is covered for that claim by the Policies.

Just as Insurers try (unjustifiably—and unsuccessfully) to carve out an exception to Section 154 for D & O policies, so they try to escape the force of the rule exemplified by *Western States* by urging the present cases involve D & O insurance, while *Western States* did not. Again the purported distinction is without legal significance: *Western States'* rationale for denying an insurer subrogation rights against its own insured applies here with equal force.[17] Each Insurer accepted a premium from CIC, in return for which it agreed to indemnify CIC and its officers and directors for certain claims made against them. Although the Policies exclude certain types of wrongful conduct by their insureds from coverage, the Policies also expressly prohibit such wrongful conduct by one insured from being attributable to other innocent insureds (see Clause 4).

Thus the Policies expressly anticipate situations where wrongful conduct by certain insureds might result in claims being made against all insureds, but in that event the Policies exclude only those actually responsible for the wrongful conduct from coverage. Part of the risk Insurers accepted was to indemnify those innocent insureds for their losses caused by the misconduct of other insureds. Insurers cannot avoid that contractual obligation by themselves seeking indemnity (via subrogation) from their own "guilty" insureds. Even though Insurers need not indemnify the "guilty" insureds for their own losses, Insurers still have a contractual obligation (to all their insureds) to indemnify the innocent insureds for their losses.

Put a bit differently, by issuing the Policies Insurers expressly accepted the risk some of their insureds might commit intentional fraud and injure other insureds. In-

surers' only remedy against such "guilty" insureds is noncoverage. Were Insurers allowed subrogation against those guilty insureds for payments made to the innocent insureds, Insurers would escape the bargained-for detriment for which they charged their premiums.

### Conclusion

Insurers' Counterclaim against Continental and Individual Defendants fails to state a claim upon which relief can be granted. It is dismissed with prejudice.

**17.** As in *Western States,* 26 Ill.App.2d at 388, 167 N.E.2d at 838:

[U]nder principles of common law subrogation, the payment by [Insurers] (the party primarily liable by reason of the contract of insurance) would in face [sic] constitute a satisfaction of [any] judgment in favor of [the innocent insureds] for the use of [Insurers] against [the guilty insureds].

Insurers therefore have no right to recover, as subrogees, whatever amounts they may have to pay on claims against the innocent insureds. Those innocent insureds have made a permissible choice: to hold Insurers liable under the Policies, rather than to seek any recovery from the guilty insureds. Insurers are contractually obligated to honor that choice.