Robert **FLEMING**, Plaintiff,

v.

**KANE COUNTY, et al., Defendants.**

**No. 85 C 8641.**

United States District Court, N.D. Illinois, E.D.

July 29, 1987.

Heidi H. Katz, Steven B. Adams, Fawell, James and Brooks, Naperville, Ill., for plaintiff.

Gerard B. Gallagher, Gallagher, Joslyn & McGurn, Oak Brook, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Robert Fleming ("Fleming") sues Kane County ("County") and its Highway Super-intendent Nabi Fakroddin ("Fakroddin"), asserting claims under:

> 1. 42 U.S.C. § 1983 ("Section 1983") for violating Fleming's First Amendment rights (the "First Amendment Claim"); and

> 2. Illinois common law for commit-ting the tort of retaliatory discharge (the "Retaliatory Discharge Claim").

Both defendants have now moved for sum-mary judgment under Fed.R.Civ.P. ("Rule") 56 as to the First Amendment Claim. Each defendant has moved sepa-rately for dismissal of the Retaliatory Dis-charge Claim under Rule 12(b)(1), urging it is time-barred because Fleming failed to comply with the one-year notice provision of the Illinois Local and Governmental and Governmental Employees Tort Immunity Act (the "Act"), Ill.Rev.Stat. ch. 85, ¶¶ 8–102 and 8–103.

Defendants have mislabeled the latter motion as jurisdictional, for Act § 8–103 says only that an action commenced with-out notice "shall be dismissed." Indeed the notice provision has been held a limitation provision rather than a condition precedent to suing, so a public entity may choose to waive notice under that provision (*Rio v. Edward Hospital*, 104 Ill.2d 354, 362, 84 Ill.Dec. 461, 464, 472 N.E.2d 421, 424 (1984))—an impossibility if jurisdiction were lacking. That being so, this opinion also treats the motions to dismiss the Re-taliatory Discharge Claims as summary judgment motions.[1]

For the reasons stated in this memoran-dum opinion and order:

> 1. Defendants' motion as to the First Amendment Claim is denied.

> 2. Each defendant's motion as to the Retaliatory Discharge Claim is granted.

---

1. There is an open question as to the propriety of a one-issue summary judgment motion that intends to hold other factual and legal issues in reserve if the first motion loses (see this Court's opinion in *Teamsters Local 282 Pension Trust Fund v. Angelos*, 649 F.Supp. 1242, 1252–53 (N.D.Ill.1986)). One feasible option is the use of an issue-narrowing motion under Rule 16. But because Rule 16 does not confer the power to enter judgment (*Fidelity and Deposit Co. of Ma-ryland v. Southern Utilities, Inc.*, 726 F.2d 692, 693 (11th Cir.1984)), and because defendants in fact succeed on their motions, the motions will be treated as brought under Rule 56. Of course the alternative of Rule 12(b)(6) dismissal is un-available because each defendant has submitted matter outside the pleadings (an affidavit) in support of the motion.

It is necessary to sketch the facts in some detail before the motions may be considered.

### Facts [2]

From January 1, 1968 until June 7, 1984 Fleming—a registered civil engineer—worked as County's Assistant Superintendent of Highways (¶ 1). In 1983 County solicited bids on a contract to improve County Highway 83 by building an overpass over Illinois Highway 5 (the "Orchard Road Project") (¶ 4). County's original bid specifications required the contractor (1) to excavate "borrow" material needed for the overpass foundation from property owned by County's Forest Preserve District and (2) to transport the material to the construction site 2.9 miles away (¶¶ 5 and 6).

Fleming asked then Superintendent William Carter ("Carter") to move the borrow site to a location closer to the construction site, in response to inquiries from several prospective bidders (Fleming Dep. 771–75, 777–78). Carter refused (id. at 775–76). On August 26, 1983 County awarded the general construction contract to A.J. Maggio Co. ("Maggio") for $1,163,700 (¶¶ 4 and 7), a figure $34,300.49 below the next lowest bid (¶ 7). Maggio's bid on the "suitable borrow" item was $262,314 or $2.60 per cubic yard (¶ 8). Other bids ranged from $3.30 to $5.00 per cubic yard, and Maggio's bid on the borrow item was $90,801 less than the second lowest bidder on the entire

project (id.). Though the parties' factual submission does not say so in so many words, it appears clear that Maggio's bid exclusive of the borrow item would *not* have been the lowest bid on the project—and that Maggio would also likely not have been the low bidder even on the total contract, including the borrow item, *if* the cost allocable to the borrow item was appreciably less than that anticipated by the 2.9 mile trucking specification. This opinion does not at all hinge on that likelihood, however.

Shortly after the contract had been awarded to Maggio, the borrow pit was changed to a location only about 1,000 feet from the construction site, a significant reduction in the haul mileage (¶ 9). When Fleming learned of that change October 10, 1983, he urged Carter to lower the price County paid Maggio for the borrow material (Fleming Dep. 796–97 and 811–12). Carter rejected the suggestion and repeatedly declined to discuss the matter with Fleming (id. at 795–812 and 830). Thus the contract for the Orchard Road Project was not relet, nor was an adjustment ever made to the price County paid Maggio (¶ 10). On the day after Fleming raised the issue with Carter (October 11, 1983), the latter announced his intention to retire from his post effective January 1, 1984 (¶ 11).

Because he had been given no explanation for the borrow pit change and saw no authorization for the change in the project

**2.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Fleming (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). This factual recitation is drawn primarily from the Statement of Uncontested Facts (designated "¶ —") contained in the May 15, 1987 Final Pretrial Order (the "FPTO"). References to contested facts in the FPTO's "Agreed Statement of Contested Issues of Fact and Law" will take the form "Contested Fact ¶ —." Allegations in Fleming's Second Amended Complaint (the "Complaint") will be cited "C–I ¶ —" (allegations in Count I, the First Amendment

Claim) or "C–II ¶ —" (allegations in Count II, the Retaliatory Discharge Claim). Finally, the parties' memoranda will be cited this way:

1. "D–I Mem.—" and "D–I R. Mem.—" (defendants' joint initial and reply memoranda on the First Amendment Claim);

2. "County Mem.—" or "Fakroddin Mem.—" (the initial memoranda on the Retaliatory Discharge Claim) and "D–II R. Mem." (defendants' joint reply memorandum on that claim); and

3. "Fleming-I Mem.—" or "Fleming-II Mem.—" (Fleming's memoranda on the First Amendment Claim and the Retaliatory Discharge Claim, respectively).

Fleming-I Memorandum has also tendered exhibits that, having been offered by defendants and not objected to by Fleming, are received into evidence by operation of the FPTO (see this District Court's Final Pretrial Order n. 6).

file, Fleming declined to initial the first pay estimate for the construction work in late October 1983 (Fleming Dep. 820–23, 825). In December 1983 Fleming attempted to raise his concerns with Transportation Committee Chairman Bennett Shoop ("Shoop") (*id.* at 833–34). Shoop said he did not have time to talk about the borrow pit switch (*id.* at 839–40).

On January 2, 1984, at the recommendation of a local judge (*id.* at 841–42), Fleming told County's State's Attorney Robert Morrow ("Morrow") of his belief that improprieties had occurred in the handling of the Orchard Road Project, particularly in the change of borrow pit location without adjustment in contract price (¶ 12; Fleming-I Mem. Ex. A–1). Among the documents he provided the State's Attorney was a story Fleming had written entitled "Collusion or Gross Stupidity" (Fleming Dep. 842–43), saying in part (Fleming-I Mem. Ex. A–3):

> This is a story about collusion between a top Kane County Government Official and a Contractor, or is it a story about gross stupidity on the part of the Government Official, you be the judge.
>
> *    *    *    *    *    *
>
> Until this project came along, I was in charge of all design and construction for the Kane County Highway Department. I wasn't allowed in other areas do [sic] to games that were being played. Until this project design and construction was kept clean.
>
> *    *    *    *    *    *
>
> If I do nothing to stop this, then I Have [sic] condoned it, and I'll be damned if I am going to condone something like this after all these years.

On January 12 Morrow assigned Assistant State's Attorney William F. Barrett ("Barrett") to investigate Fleming's charges (¶ 12).

Fleming wrote another letter (Fleming-I Mem. Ex. A–1, dated January 12, 1984),

apparently mailed to various contractors,[3] which said in part:

> On January 3, 1984, I sent papers to the Kane County State's Attorney's Office regarding the irregular handling of the above project on which you were one of the bidders on August 26, 1983.
>
> *    *    *    *    *    *
>
> My contention is that this is a completely different contract and should have been re-let.
>
> After repeated disagreements with Mr. Carter on this matter, I brought it to the attention of the State's Attorney for him to determine if this is a legal manuver [sic] and will be permitted on future contracts, not only in Kane County but thru-out the State. I bring this to your attention to let you know that I am thourghly [sic] against this type of practice.

Fleming sent an almost identical letter (Fleming-I Mem. Ex. A–2, dated March 1, 1984) to Illinois Attorney General Neil Hartigan. That letter concluded this way:

> To date I have not heard from Mr. Morrow, and it is my impression that he is more interested in protecting the Officials of Kane County than he is in protecting the people of Kane County from a possible scam that is worth between $140,000 and $200,000.

Finally Fleming provided information about the Orchard Road Project to the FBI, which had been brought into the matter by the County Clerk after Fleming had brought the issue to County (¶ 12; Fleming Dep. 582–83).

On March 1, 1984 Fakroddin was appointed County's Highway Superintendent to succeed Carter (¶ 13). Counseled by Barrett in his capacity as legal advisor to the Highway Superintendent, Fakroddin suspended Fleming with pay from April 9 to April 16 (¶ 14). On April 24 Fleming told Fakroddin he did not "have the guts to fire" Fleming and "wouldn't make a pimple on an engineer's ass" (¶ 15). From May 21

---

**3.** Fleming-I Mem. Ex. A–1 comprises the letter and a list (on two separate sheets of paper) of contractors.

to May 26 Fakroddin suspended Fleming again, this time without pay (¶ 14).

On May 25 the State's Attorney issued a report by Barrett that concluded Fleming's charges were groundless (¶ 16). According to the report, the contract for the Orchard Road Project was not relet or adjusted because the general contractor had agreed to forego charging for additional overtime hours incurred by the end of 1983 in completing the excavation, hauling and placement of the borrow (¶ 10).

On June 7 Fakroddin terminated Fleming's employment (¶ 17). Fleming first appealed that decision to County's Grievance Committee. During that Committee's August 8 hearing Fakroddin presented a written statement of the reasons for Fleming's termination: Fleming's insubordinate behavior and inadequate job performance (Hearing Tr. 12–14).[4] Fleming in turn charged his perfect work record had been "loaded" with adverse reports following his complaints about the Orchard Road Project (*id.* at 6, 8). Fleming lost at the Committee level (C–I ¶ 29), then appealed to County's Executive Committee. In March 1985 that Committee also affirmed the discharge (C–I ¶ 30). Fleming has not asserted any wrongdoing in connection with those appeals (C–I ¶¶ 29–30).[5]

On October 11, 1985 Fleming filed this action. He charges defendants' intentional acts resulted in loss of income, injury to his professional reputation and severe mental anguish (C–I ¶ 33 and C–II ¶ 35).

*First Amendment Claim*

Fleming alleges defendants' acts were taken to punish him for exercising his constitutional right to speak freely and without retaliation as a local government employee on a matter of public concern (C–I ¶ 31). As Justice (then Judge) Stevens explained in *Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1, 4–5 n. 12 (7th Cir.1974), those allegations state a claim under the Due Process Clause for deprivation of liberty: the liberty interest in free speech. See also *Altman v. Hurst,* 734 F.2d 1240, 1243 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984).

In his May 14, 1987 response to defendants' Request to Admit (D–I Motion Ex.), Fleming admitted (emphasis added):

> that the existence of a property or liberty interest *in his employment* with the Kane County Highway Department is not at issue....

Defendants' promptly-filed motion then sought dismissal of the First Amendment Claim because Fleming had not alleged either:

> 1. deprivation of a liberty interest in his employment (no "stigma plus" foreclosing other employment), or
>
> 2. deprivation of a property interest in his employment (no expectation of, or entitlement to, continuing employment).

That obvious misperception of the issue prompted this Court to write a May 26, 1987 letter to defendants' counsel Gerard Gallagher (with copies, of course, to other

---

**4.** Among other things, Fakroddin said during the hearing (*id.* at 17–18):

I would also like for the committee to know the facts right now that for the last three years, Mr. Fleming has done one [sic] little work, and the taxpayers's of this county have paid him $37,140 a year for keeping his feet on his desk, listening to the news, listening to the radio loud and clear. And he comes as he pleases, leaves as he pleases, drives home during lunch hour 20 miles from the office at the taxpayers' expense with a car given to him. And on top of that to every employee there, he has aggravated them. He has stopped them from working, interferred [sic] with their operations.

**5.** It is true that C–I ¶ 31 alleges that "defendants' acts set out in paragraph [29 and 30, among others,] were taken to punish plaintiff...." But of course no member of either Committee is included among the "defendants" in this action. And if any doubt or ambiguity existed as to the absence of any claim of wrongdoing on the part of the Committee members, that would have been eliminated by the fact that Fleming did not oppose, and this Court granted, defendants' May 18, 1987 motion in limine to prohibit Fleming from introducing evidence as to the appeals process. This is not to say, of course, that Fleming might not claim he suffered further *damage* when Fakroddin repeated his charges before the Committees.

counsel), advising him that his then-forth-coming memorandum should address Fleming's claimed deprivation of a liberty interest *in free speech*. See *Jungels v. Pierce*, 825 F.2d 1127 (7th Cir.1987) for a more recent and extended discussion of the three legal bases for Section 1983 claims by terminated public employees that were summarized briefly in this Court's May 26 letter. Defendants' later submissions speaking to that claim confirm their summary judgment motion should never have been filed.

■ As a preliminary matter, the parties have agreed the crucial facts in connection with the First Amendment Claim are contested (Contested Fact ¶¶ 1–2):

1. Whether plaintiff's constitutionally protected activity in relation to the Orchard Road project was a substantial or motivating factor in employment disciplinary measures taken against him, culminating in his termination.

2. Whether defendants would have disciplined plaintiff and terminated his employment in the absence of the protected activity.

That dispute means this Court, in resolving the summary judgment motion, must assume Fleming *was* terminated because he spoke out about the Orchard Road Project.

■ Forced to concede that, D–I Mem. 4–5 nonetheless urges summary judgment is appropriate because Fleming's speech was about a matter of "personal interest" to Fleming rather than a matter of "public concern" and thus was not "protected" under the First Amendment (*Connick v. Myers*, 461 U.S. 138, 146–49, 103 S.Ct. 1684, 1689–91, 75 L.Ed.2d 708 (1983)). D–I Mem. 8 characterizes Fleming's speech this way (a verbatim copy, mistakes and all):

However, an examination of the pleadings and the evidence showed that the real "bone of contention" was that Car-

ter, and the County did not agree with Fleming's opinion, and said that the Contract would not be relet. At most, the failure to relet a contract, even if a violation of some state statute, is simply an internal matter to be resolved between the County of Kane, and Illinois Department of Transportation, and the other public bodies involved. In his deposition, [Fleming] complained at great length of "defective" contract terms, and complained that the contract terms were not completely complied with. (Deposition Volume 4, at pages 597–604). However, in the final analysis, he simply had to admit that he disagreed with the opinion of Carter and Ben Houden of IDOT. (Deposition transcript at 618). As far as having any proof that there was actual criminal wrongdoing, including bribery or misappropriation of funds, [Fleming] admitted that "all I had was suspicion." (Deposition Transcript, 622–623).[6]

Defendants' focus on whether or not Fleming had "proof" of "actual criminal wrongdoing" misses the point entirely. *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91 teaches it is the "content, form, and context of a given statement" that determines whether or not it is about a matter of public concern. Speech designed (*id.* at 148, 103 S.Ct. at 1690) (emphasis added):

to bring to light actual or *potential* wrongdoing or breach of public trust....

clearly falls within that category. True enough, Fleming disagreed with the decision not to relet the Orchard Road contract or to reduce the amount paid to Maggio. But his "speech" also made it quite clear he suspected (understandably so) the reason for that decision was "collusion" between a government official and a contractor: Fleming wrote of a "possible scam"

---

6. For some unexplained reason, D–I Mem. 8–9 follows that argument with a discussion of Illinois cases involving the public policy exception to at-will employment. Though that discussion is relevant to the Retaliatory Discharge Claim (addressed in defendants' separate memoranda), it has no bearing at all on the First Amendment Claim at issue here. What the argument obviously reflects is defense counsel's continued misapprehension of the issues that marked the initial motion—as though the claim was about Fleming's liberty or property interest in his *employment*.

costing County's citizens between $140,000 and $200,000.

Under the uniform case law (as well as the common-sense meaning of language) it is really absurd for defendants to challenge that speech as not being about a matter of public concern. That conclusion is compelled by a comparison with the speech found to have satisfied the "public concern" test in *Rankin v. McPherson,* —— U.S. ——, 107 S.Ct. 2891, 2895, 97 L.Ed.2d 315 (1987) ("if they go for him [President Reagan] again, I hope they get him") and *Jungels,* at 1129 (letter about "minorities ... slowly deteriorating our neighborhoods"). Moreover, Fleming (unlike the plaintiff in *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690) communicated his suspicion to law enforcement agencies charged with investigating corruption—the State's Attorney, the Attorney General, the FBI. In the face of such evidence, it is really inconceivable for defendants to assert Fleming was concerned only with a personal matter about whether a contract should have been relet. Nothing in the case law even hints at any support for defendants' theory that speech communicating merely a "suspicion" of governmental corruption is not protected if it turns out those suspicions are wrong or cannot be proved. And as Fleming-I Mem. 6 correctly points out:

> Whether or not Assistant State's Attorney Barrett's report provided a plausible justification for rejecting Mr. Fleming's charges, the County certainly did not shrug them off as a "disagreement with his superiors over technical points of procedure".…

■ True enough, an employee such as Fleming may be discharged even for speaking out on a matter of public concern *if* the employee's interest in commenting upon such matters is outweighed by those of the state employer in promoting the efficiency of the public services performed through its employees (*Patkus v. Sangamon-Cass Consortium,* 769 F.2d 1251, 1258 (7th Cir. 1985)):

> Even speech involving matters of public interest can legitimately lead to negative

employment action if it is so disruptive as to impede the employee's performance of his or her job. *Connick,* 461 U.S. at 149–52, 103 S.Ct. at 1691–93; *Pickering [v. Board of Education of Township High School,]* 391 U.S. [563,] 568 [88 S.Ct. 1731, 1734, 20 L.Ed.2d 811] [(1968)].…

But any such contention was totally absent from defendants' initial memorandum, and Fleming-I Mem. 3–4 said so.

Nothing daunted, D–I R. Mem. 4 baldly asserts County's interests outweighed Fleming's:

> [T]he interest of Kane County, as employer, outweigh [sic] any interest that the Plaintiff might have had in complaining about the Orchard Road Project since Plaintiff had no evidence and had no good faith belief that actual criminal wrongdoing had transpired.

That ipse dixit does defendants no credit. First, it fails even to identify what County's interest is. Second, it improperly resolves a disputed factual issue (whether Fleming had a good faith belief that actual corruption had occurred) in favor of defendants rather than Fleming. Finally, even were it true Fleming had no "evidence" to support his suspicion (an insupportable proposition in the present context), that did not reduce his free speech interest.

■ Defendants preserve their perfect losing record on the First Amendment Claim with an equally nonmeritorious final argument. Citing Justice Stevens' opinion in *Jeffries,* 492 F.2d at 4–5 n. 12, D–I R. Mem. 2–4 urges Fleming unwittingly waived his First Amendment Claim because:

> 1. Under Justice Stevens' analysis Fleming has asserted a claim for deprivation of liberty.
>
> 2. Fleming's May 14, 1987 admission says the existence of a liberty interest in his employment is not at issue. That admission is "broad enough to defeat any claim under the First Amendment."

Simply to state such arrant nonsense is to expose its poverty as a legal proposition. Fleming's admission was merely that no

liberty interest *in his employment* is at issue (because that was the way defendants chose to frame their request for admission). That admission was a totally accurate reflection of Fleming's claim in analytical terms—and that was so obviously the case that it triggered this Court's letter to counsel pointing that out. There is just no way to construe that admission to mean Fleming's entirely distinct liberty interest in *freedom of speech* is not at issue in this lawsuit.

Indeed, even such an admission would be unlikely to have been fatal to Fleming's lawsuit in any case. Suppose defendants' Request to Admit had spoken in the right way—in terms of a liberty interest of *any* kind. And suppose Fleming had admitted that (say under the mistaken belief that his claim may be advanced directly under the First Amendment—after all, courts always talk that way, even though they know state actors are responsible only under the Fourteenth Amendment). In all likelihood, such a scenario would have led this Court to permit withdrawal or amendment of the admission under Rule 36(b).

Advisory Notes to the 1970 Amendment of Rule 36 explain that admissions are designed to:

1. facilitate proof with respect to issues that cannot be eliminated from the case and

2. narrow the issues by eliminating those that can be.

Neither purpose would be served by construing a broad and general admission to mean something quite specific and unintended by the party making the admission. Defendants would have this Court, using semantics, construe Fleming's general admission to be an unwitting waiver of the very claim he seeks to litigate. And again, all this would give defendants the benefit of a reading to which they are not entitled.

In sum, defendants have failed utterly not only to provide any basis for granting their motion for summary judgment on the First Amendment Claim, but also to suggest any basis for filing that motion. It is denied.[7]

### Retaliatory Discharge Claim

To establish his Retaliatory Discharge Claim, Fleming alleges (C–II ¶¶ 32–33):

32. Defendants brought about the discharge of plaintiff as described above to punish and retaliate against him for reporting suspected criminal violations of state and federal law to authorities and offering to assist in any investigation thereof by said authorities.

33. Said discharge from employment directly contravenes clearly established public policies protecting citizens who fulfill their civic duty to report violations of the law to responsible authorities.

Defendants do not say that fails to state a claim for retaliatory discharge. These principles established by *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 128–33, 52 Ill.Dec. 13, 15–16, 421 N.E.2d 876, 878–79 (1981) preclude any such contention:

1. Illinois recognizes the tort of retaliatory discharge as an exception to the rule of "at-will" employment.

2. Such a retaliatory discharge occurs when an employee is discharged in violation of an established public policy.

3. Any discharge for supplying information to law enforcement agencies

---

7. Our Court of Appeals has shown a dramatic reversal of attitude toward sanctions in the past two years—moving from its earlier reluctance to approving them to a real alacrity in approving or imposing them. Most recently it has not only been assessing fee-shifting awards for lawyers' work done before it, but has also reversed district judges' denials of Rule 11 motions (see, e.g., *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d. 1073 (7th Cir.1987)) or has even mandated district judges sua sponte to consider applying Rule 11 though neither the litigants nor the judge had raised the issue (see, e.g., *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 819 (7th Cir.1987)). This Court (though perhaps somewhat less aggressive than that) has been reluctant, in appropriate cases, to act "upon its own initiative" as Rule 11 allows. This however appears an appropriate case for doing so, for there seems no legitimate reason for defendants' having forced Fleming and his counsel to confront such an empty First-Amendment-oriented motion (especially after this Court's May 26 warning letter).

about another employee's possible violation of the state Criminal Code constitutes a discharge in violation of established public policy.

Instead of launching a necessarily unsuccessful attack on those principles, each defendant asserts the Retaliatory Discharge Claim is barred because Fleming failed to comply with the notice requirements of Act §§ 8–102 and 8–103.[8] When his claim accrued, Act § 8–102 provided:

> Within 1 year from the date that the injury or cause of action, referred to in Sections 8–101, 8–102 and 8–103, was received or accrued, any person who is about to commence any civil action for damages on account of such injury against a local public entity, or against any of its employees whose act or omission committed while acting in the scope of his employment as such employee caused the injury, must serve ... notice on the Secretary or Clerk....

Act § 8–103 provided:

> If the notice under Section 8–102 is not served as provided therein, any such civil action commenced against a local public entity, or against any of its employees whose act or omission committed while acting in the scope of his employment as such employee caused the injury, shall be dismissed and the person to whom such cause of injury [sic] accrued shall be forever barred from further suing.

Each defendant claims Fleming's injury was received, or his cause of action accrued, June 7, 1984—the date he was terminated. At that point all the elements for the cause of action—duty, breach and injury—were present (*Moorman Manufacturing Co. v. National Tank Co.*, 92 Ill. App.3d 136, 149, 47 Ill.Dec. 186, 196, 414 N.E.2d 1302, 1312 (4th Dist.1980), *rev'd in part on other grounds*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982)). On that view Fleming's notice in October 1985 —given by filing this action (*Dunbar v. Reiser*, 64 Ill.2d 230, 237, 1 Ill.Dec. 89, 91–92, 356 N.E.2d 89, 91–92 (1976))[9]—was four months late.

Fleming disagrees. He concedes (by his silence) that the retaliatory discharge tort is covered by the notice requirement then imposed by the Act.[10] But he urges his filing of this action satisfied the one-year notice requirement for two reasons:

1. He did not receive his injury, nor did his cause of action accrue, until at least March 1985 (when County's Executive Committee affirmed his dismissal).

2. Even if his cause of action did accrue upon his discharge in June 1984, commencement of the one-year notice period was tolled during the pendency of his appeals before the Grievance and Executive Committees.

In support of the March 1985 accrual date, Fleming-II Mem. 5–6 cites *Starcevich v. City of Farmington*, 110 Ill.App.3d 1074, 1079, 66 Ill.Dec. 811, 814, 443 N.E.2d 737, 740 (3d Dist.1982):

---

**8.** Act § 8–102 was repealed effective November 25, 1986. Because Fleming's cause of action accrued before that date, both sides agree lack of notice (if proved) bars the Retaliatory Discharge Claim.

**9.** Each defendant has tendered, along with his or its motion, the affidavit of County Clerk Lorraine Sava. That affidavit establishes Fleming never provided notice to the County Clerk (other than by filing this action).

**10.** Neither side has identified an Illinois case holding that the Act either does or does not apply to retaliatory discharge torts. In that respect, Act § 8–101 (referred to by Act § 8–102) refers to the cause of action in the most generic possible way: a "civil action ... for any injury." It would require real judicial editing to

read any kind of tort action out of that statutory coverage. One other argument Fleming-I Mem. 7–8 *does* advance is that under Act § 9–103(c) defendants have waived their right to seek dismissal on notice grounds to the extent (if at all) County has insurance covering Fleming's claim. That contention fails, for D–II R. Mem. 4–5 says County was self-insured at all times relevant to this Complaint, eliminating the possibility of waiver (*Antiporek v. Village of Hillside*, 114 Ill.2d 246, 249, 102 Ill.Dec. 294, 295, 499 N.E.2d 1307, 1308 (1986)). It therefore becomes unnecessary to decide whether the November 25, 1986 amendment to Act § 9–103(c) (which changed the waiver rule) could apply retroactively to Fleming's claim.

Where a tort involves repeated injury, the statute of limitations in Illinois begins to run from the date of the last injury or when the tortious acts cease. Fleming-II Mem. 3 reasons Fleming suffered such repeated injury from defendants' wrongful conduct after his discharge during the two appeals. That would mean his cause of action did not accrue until at least March 1985, upon completion of his last appeal (*id.*):

> Plaintiff Fleming has properly and carefully pleaded the hearings and decisions of the Grievance and Executive Committees of the Kane County Board of Commissioners and has properly alleged that the actions and conduct of those hearings were a cause of the injuries Fleming sustained. In fact, plaintiff's injuries continue today in the form of lost reputation (not rectified by any action by the County to this time) and can in no way be considered "received" prior to the Executive Committee's affirmance of his termination in March, 1985 (*See* Paragraph 30, 31 Count II, Second Amended Complaint). Fleming has pleaded both that defendants' wrongful conduct continued after termination, and that his injuries were received before, during and after termination.

But examination of the Complaint reveals Fleming has *not* alleged any post-termination wrongful conduct in connection with the two appeals of his discharge. All the Complaint says is that each Committee upheld the discharge. Indeed, the entire predicate for defendants' motion in limine to preclude the introduction of evidence as to the appeals was their lack of relevance to Fleming's claim—and Fleming *did not oppose* that motion (see n. 5). And of course the mere fact those Committees upheld Fakroddin's decision does not make the Committees' acts wrongful.

■ So what it comes down to is that Fleming must argue (1) he suffered "repeated injury" when his discharge was reviewed by each Committee and then upheld by the Committee's non-wrongful action and (2) his cause of action did not accrue until he sustained the last of those injuries. On the first of those matters, D–II R. Mem. 3 (emphasis in original) seems quite right in saying:

> It is illogical for Plaintiff to maintain that because *he* chose to avail himself of the opportunity provided by the County to reverse Defendant Fakroddin's decision and because Defendant Fakroddin presented his side of the story during the appeals process, Plaintiff's appeal constituted a repeated injury by Defendant Fakroddin.

At best Fleming may be able to establish continuing injury to his reputation and additional mental anguish from Fakroddin's representations to the Committees. But under Illinois law (*Del Bianco v. American Motorists Insurance Co.*, 73 Ill.App.3d 743, 747, 29 Ill.Dec. 563, 567, 392 N.E.2d 120, 124 (1st Dist.1979) (citations omitted)):

> Ordinarily, a plaintiff's cause of action in tort accrues at the time its interest is invaded. Therefore, the mere fact that the extent of its damages is not immediately ascertainable does not postpone the accrual of the claim. This is clearly the rule for a pure tort cause of action.

Fleming thus loses his argument. His Retaliatory Discharge Claim accrued June 7, 1984 when he was discharged, even though he may later have suffered continuing harm to his reputation and additional mental anguish during the two appeals of that decision.

■ One issue remains. Even assuming his cause of action accrued June 7, 1984, Fleming charges the commencement of the one-year-notice period was tolled during the pendency of his two appeals. Fleming cites no authority (understandably so) in support of such a tolling rule. As D–II Mem. 5 notes, Illinois cases have consistently held the mere pendency of an appeal does not postpone the commencement date of a statute of limitations (e.g., *Sager Glove Corp. v. Continental Casualty Co.*, 37 Ill.App.2d 295, 300–01, 185 N.E.2d 473, 475 (2d Dist.1962)).

Fleming-II Mem. 4–5 retorts none of those cases are like this one where:

> 1. "[E]vidence relevant to the cause of action is reviewed and acted upon by the defendant/employer."
>
> 2. "[D]efendants themselves are conducting the actual hearing and deciding the appeal."

But Fleming is silent as to why either distinction is relevant, especially given his failure to allege any wrongdoing in connection with those appeals. After all, as the Supreme Court explained in *Delaware State College v. Ricks*, 449 U.S. 250, 261, 101 S.Ct. 498, 505 66 L.Ed.2d 431 (1980) (emphasis in original), dealing with a similar limitations question:

> But entertaining a grievance complaining of the [adverse employment] decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made.

Thus *Ricks* rejected the employee's argument that the statute of limitations began to run when his grievance was denied, rather than when the initial adverse employment decision was made.

Here too Fakroddin's decision was not tentative. That being so, Fleming's cause of action accrued when that decision was made, despite Fleming's later efforts to challenge it before the Grievance and Executive Committee. Accordingly, the one-year notice period began to run June 7, 1984, rendering Fleming's October 22, 1985 notice (through the filing of this action) untimely. His Retaliatory Discharge Claim is dismissed.

## Conclusion

There is a genuine issue of material fact as to whether defendants violated Fleming's First Amendment rights. Summary judgment on that claim is thus inappropriate. As the final item of business on that score, on or before August 12, 1987:

> 1. Defendants' counsel are ordered to file a statement as to the basis (if any) for the belief that their motion was "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law" (Rule 11)— particularly after this Court's May 26, 1987 admonitory letter.
>
> 2. Counsel for the parties are directed to confer as to the amount of Fleming's attorneys' fees and other expenses attributable to that motion, with a view toward minimizing any added expense in an evidentiary hearing on that subject if Rule 11 sanctions are imposed.[11]

This action is set for a status hearing August 20, 1987 at 9 a.m. to discuss those issues.

As for Fleming's Retaliatory Discharge Claim, there is no disputed factual issue to question the conclusion that notice of the claim was untimely. Defendants' motions to dismiss that claim are granted, and the claim is dismissed with prejudice.

---

**11.** While on the subject of Rule 11, this Court notes the Answer defendants recently filed to Fleming's Second Amended Complaint. Among the affirmative defenses they advance is one stating this Court "lacks subject matter jurisdiction." Of course this opinion's disposition of defendants' challenge to the First Amendment Claim scotches that—but defense counsel must also be aware that even had their current motion been successful, it would be wrong to char- acterize the flaw as "jurisdictional." If that were so, no ruling could ever be issued rejecting (say) a Section 1983 complaint for failure to state a cause of action under Rule 12(b)(6) or granting summary judgment under Rule 56—for in defendants' universe the very absence of a cause of action would deprive the court of subject matter jurisdiction. In that sort of Catch-22 analysis, the court could never decide a case on the merits.